MERCANTILE-SAFE DEPOSIT AND TRUST COMPANY
*v.* DELP AND CHAPEL CONCRETE AND
CONSTRUCTION COMPANY ET AL.

[No. 65, September Term, 1979.]

*Decided November 6, 1979.*

The cause was argued before LOWE, MASON and COUCH, JJ.

*Nell B. Strachan,* with whom was *Francis D. Murnaghan, Jr.,* on the brief, for appellant.

*H. Emslie Parks,* with whom were *Wright & Parks* on the brief, for appellees.

COUCH, J., delivered the opinion of the Court.

This appeal arises from a suit brought by appellees, Delp and Chapel Concrete and Construction Company (hereinafter D & C), a Maryland corporation, Andrew V. Caldwell, Jr., D & C's trustee in receivership, R. John Chapel, Virginia Chapel, Logan Delp and Eulalia Delp, against appellant, Mercantile-Safe Deposit and Trust Company (hereinafter Mercantile). D & C's declaration contained three counts. In Count One D & C sought recovery for Mercantile's alleged wrongful dishonor of twelve checks drawn on D & C's checking account with Mercantile. In Count Two the corporation and the individuals sought recovery for Mercantile's alleged conversion of the funds in the checking account. In Count Three all appellees sought recovery for Mercantile's alleged malicious interference with their business. Both compensatory and punitive damages were claimed in each count. Mercantile counterclaimed against D

& C and the individuals for the balance due it on an unpaid debt of D & C. Prior to trial, Mercantile moved to dismiss the individual plaintiffs from Counts Two and Three; the motion was denied without prejudice. The case proceeded to trial before a jury in the Circuit Court for Baltimore County, during which a timely motion for a directed verdict was made at the close of plaintiffs' case, and renewed at the close of all the evidence. These were also denied.

The jury returned a verdict for D & C on Count One (wrongful dishonor), awarding compensatory damages of $9,343.60 and punitive damages of $25,000.00. The verdict on Count Two (conversion) was returned in favor of all the appellees. Each appellee, excluding Logan Delp, whose absence during the trial led the trial court to rule that he was not entitled to punitive damages, was awarded both compensatory and punitive damages on Count Two. Mercantile prevailed on Count Three (malicious interference with business) and upon its counterclaim. Contented with the verdicts on Count Three and the counterclaim, Mercantile concerns itself in this appeal only with the judgments resulting from the verdicts rendered against it on Counts One and Two. No cross appeal has been filed by appellees.

The events leading up to this appeal began in January of 1974 when John R. Chapel, general manager of D & C, met with Frank Musotto, a commercial loan officer with Mercantile, in order to arrange financing for the fledgling corporation.[1] Chapel was given various forms to fill out. Upon D & C's opening of a checking account with Mercantile and the signing of personal guarantees by John and Virginia Chapel and Logan and Eulalia Delp, Mercantile approved D & C's request for an unsecured line of credit and agreed to lend D & C a maximum of $10,000.00 on this line of credit. D & C also obtained two secured installment loans from Mercantile. The first was a $2,100.00 loan for a station wagon, secured by the vehicle; the loan was dated February 21, 1974. On August 2, 1974 D & C borrowed $7,000.00 to purchase equipment. This loan was secured by the equipment. The

---

1. D & C was formed in July of 1973.

obligations under these loans were met by D & C without incident.

The line of credit transactions are the source of the present conflict. Mercantile made twelve advances under its terms to D & C between March 5 and September 14, 1974. The majority of the notes were paid or formally renewed on or before the date of maturity, with the exception of the following notes: the note of April 17 was paid one day late (due April 30 and paid May 1); the note of May 7 was paid four days late (due June 6 and paid June 10); and the note of May 20 was paid seven days late (due June 3 and paid June 10). The last note, dated September 14 and due on October 14 (the actual due date was Sunday, October 13, 1974) was not paid on the due date. John Chapel testified at trial that he requested of Mercantile and received an oral two week extension of the due date until October 31. The existence of the extension was disputed by the testimony of the Mercantile officers, but the jury apparently accepted Mr. Chapel's version. Nonetheless, it was undisputed at trial that D & C failed to pay the September 14 note upon the extended due date, October 31.

Frank Musotto, the commercial loan officer in charge of D & C's account, reviewed the terms of the September 14 note on November 4, 1974 and, relying upon a cross-default clause contained in it, decided to charge the D & C checking account for the principal and interest of the September 14 note and the remaining balances on the two installment loans. The cross-default clause of the September 14 promissory note states as follows:

> "Upon the happening of any of the following events, each of which shall constitute a default hereunder, all liabilities of each maker to bank shall become immediately due and payable: (a) failure of any obligor ... to perform any agreement hereunder, to pay interest hereon promptly when billed, or pay any other liability whatsoever to bank when due; ... (d) ... the insolvency of any obligor."

Mr. Musotto stated two reasons for the decision to set off the loans against the checking account: the first, of course, was

the overdue status of the September 14 note; the second reason given by Musotto was information he received from D & C's insurance agent that the corporation was going out of business. This last point was disputed at trial by the insurance agent, who testified he recalled no phone conversations with Musotto between October 14 and November 4.

Having decided to exercise the set-off rights embodied in the note, Musotto directed both the Commercial Loan and the Installment Loan Departments, on November 4, to charge D & C's checking account with the balances on the September 14 note and the two installment loans; the charges, to the extent funds were available, were made the same day.[2] Musotto further authorized that D & C's checking account be "frozen" or placed "on status" until the charges were paid. According to the Mercantile officer's testimony, the "freezing" of the account meant that checks could not be routinely paid; the account would have to be handled on an individual basis rather than by computer.

The actions taken by Mercantile on November 4 resulted in nine checks drawn against the D & C account being returned unpaid and the funds applied to the installment loans instead. The nine checks were as follows:

| Check No. | Amount | Dated | Payee |
| --- | --- | --- | --- |
| 1002 | 208.24 | 10-31 | John Chapel |
| 855 | 15.00 | 10-31 | John Chapel |
| 1000 | 35.02 | 10-31 | Virginia Chapel |
| 854 | 50.00 | 10-31 | Logan Delp |
| 1003 | 228.29 | 10-31 | Logan Delp |
| 841 | 206.12 | 10-21 | Eulalia Delp |
| 1001 | 65.21 | 10-31 | R. Leopold |
| 998 | 73.32 | 10-31 | V. Leopold |
| 993 | 134.82 | 10-24 | M. Shaw |

2. The D & C checking account showed a balance of $8,261.70 on November 4, 1974, which was insufficient to meet the entire indebtedness of $8,913.62. The bank's debits that day included $3,575.83, the principal and interest on the September 14 note, and $4,685.87, a major portion of the amount due on the two installment loans. The balance on the installment loans, $651.92, was debited against the account on November 7, 1974 after more funds became available.

These returned checks were stamped with a red box marked "NSF" and bore an additional handwritten notation "account closed". All of the above checks were either paid the second time presented or were replaced with new checks to the payees which were paid when presented. Three other checks, listed below, were presented later in November and returned marked "NSF" but not "account closed".

| Check No. | Amount | Dated | Payee |
| --- | --- | --- | --- |
| 842 | 8,247.58 | 10-23 | IRS |
| 863 | 18.63 | 11-18 | American Radio Telephone |
| 864 | 30.80 | 11-19 | Postmaster |

Chapel learned of Mercantile's charges against the account on November 5 when he called Blake Hampson, an employee of the bank who worked under the supervision of Musotto, to request an extension of the September 14 note. Hampson informed him of the set off of the note and the two installment loans and that checks were being returned. Hampson met with Chapel and the corporation's attorney, Robert Powell, at Powell's office on November 11 or 12. D & C acknowledged the propriety of the $3,575.83 set off (promissory note) but requested that the amount charged to pay off the two installment loans, $5,337.79, be reversed. Chapel and Powell were concerned that an outstanding check payable to the IRS for withholding taxes in the amount of $8,247.58 would not be honored upon presentment. Mercantile, without conceding any error, agreed to reinstate the two installment loans and return $5,337.79 to the corporation's account. On November 21, 1974, D & C's account was credited with $5,337.79.

Appellant raises a multitude of issues on appeal which we shall address selectively:

"I. Was it error to submit the question of interpretation of written contracts to the jury?

    A. Was the bank entitled as a matter of law to setoff defaulted debts against the plaintiff corporation's checking account pursuant to the corporation's written contracts with the bank?

B. If a factual question was presented, was it error to refuse to instruct:
(1) that parties are bound by the terms of written contracts (including terms which define 'default')?
(2) that upon default as defined in the written contracts a bank may legally setoff against the debtor's checking account?

II. Was it error to permit the plaintiff corporation (and individual plaintiffs not customers of the bank) to recover punitive damages:
(1) where the bank, in asserting its legal rights, relied on the terms of the written contracts?
(2) where the court refused to instruct the jury that if defendant acted in reliance on written documents and asserted its legal rights, no malice could be inferred?
(3) where there was insufficient evidence to sustain a finding of actual malice?

III. In a wrongful dishonor suit:
A. Was it error to permit the jury to find that under the facts before it the checks were wrongfully dishonored?
B. Was it error to permit the jury to award compensatory damages where no injury or damages were proved?
C. Was it error to refuse to instruct the jury on how to measure damages for wrongful dishonor?

IV. Was it error to permit the individual plaintiffs to sue the bank for an alleged conversion of the corporation's checking account funds?
A. Was it error to permit individuals who have no property interest in the funds

allegedly converted to bring the conversion suit?

B. Was it error to permit the individuals to recover in the conversion action by virtue of being named as payees on some of the returned checks?

V. Was it error to refuse to instruct the jury on how to measure damages in the conversion action?

VI. Was it error to permit plaintiffs to obtain multiple recoveries for one loss?"

*Mercantile's Decision to Set Off the Three Obligations Against D & C's Checking Account*

A fundamental question going to the heart of the appellees' allegations of wrongful dishonor and conversion must be answered first before the propriety of the trial court's submission of Counts One and Two to the jury can be considered. The question is this: Whether Mercantile was entitled as a matter of law to set off defaulted debts against D & C's checking account pursuant to D & C's written contracts with Mercantile and, as a result, did the trial court err in failing to grant Mercantile's motion for directed verdict. Since we shall conclude that the motion for directed verdict should have been granted, we need not discuss the propriety of the trial court's instructions to the jury.

The interpretation of a written contract, as a general matter, is a question of law for the court. *See University National Bank v. Wolfe,* 279 Md. 512, 521 n. 7, 369 A.2d 570 (1977); *Allen Engineering Corp. v. Lattimore,* 235 Md. 182, 187, 201 A.2d 13 (1964); *Severin v. Green,* 166 Md. 305, 307, 170 A. 731 (1933); *see generally,* 5 M.L.E., *Contracts,* § 153 (1960). The terms of a written contract, however, may be modified or waived by the subsequent conduct of the parties. *University National Bank v. Wolfe, supra* at 523; *Sullivan v. Mosner,* 266 Md. 479, 491, 295 A.2d 482 (1972) (subsequent oral agreement). Whether the subsequent conduct of the parties amounts to a modification or waiver of their contract, in this instance the terms controlling the due date of the

September 14 note, is generally a question to be decided by the trier of fact. *University National Bank v. Wolfe, supra* at 523; *Hoffman v. Glock,* 20 Md. App. 284, 289, 315 A.2d 551 (1974).

The question, then, reduces itself to one of whether there was any evidence of subsequent conduct which presented a factual issue of modification or waiver of the written terms of the September 14 note. We conclude that there was not. Appellees argue that there was ample evidence that a modification and/or waiver occurred with respect to the default term in the line of credit loan. The evidence they cite is Mr. Chapel's testimony that in the past, two week extensions for payment due on the loan had been granted orally. According to appellees, the record of line of credit notes, which shows notes paid after the due date, supports their theory of modification. Mr. Chapel also testified that he was granted an oral extension on the note due October 14 to October 31. He further stated that he had always received written notice of the past due status of a note and that in this particular instance he did not.

While the evidence of an extension of the due date to October 31 was contradictory, there was no dispute that October 31 came and went without payment of the note by D & C. The line of credit transactions reveal no basis for the appellees' contention that two week oral extensions had been granted in the past, and upon the passage of that period a further grace period was granted. As set forth previously, there were three notes which were paid, respectively, one day late (note of April 17, due April 30, paid May 1), four days late (note of May 7, due June 6, paid June 10) and seven days late (note of May 20, due June 3, paid June 10). The past practice of Mr. Chapel, with the exception of the three notes listed above, had been to go to the bank and formally renew the note if more time was needed by the corporation to make the payment. If Mercantile's determination of default and set off against the checking account had occurred within the period of the avowed extension, *i.e.,* prior to October 31, 1974, a factual dispute might exist which would require the submission of the issue of modification to the jury. That,

however, is not the case here. Robert Powell, D & C's attorney, indeed admitted the default of the September 14 note in a letter dated November 14, 1974 to Blake Hampson of Mercantile and, as we observed earlier, the factual dispute existed only as to the alleged extension to October 31. There is no dispute that the "extended" due date of October 31 was not met. The trial court, therefore, should have ruled as a matter of law that the September 14 note was in default and that under its terms the two secured installment loans were in default as well. The September 14 note provides:

> "Upon the happening of any of the following events, each of which shall constitute a default hereunder, all liabilities of each maker shall become immediately due and payable . . ."

The events relied upon by Musotto, the Mercantile officer who determined that all three obligations were in default, were the past due status of the September 14 note and the insolvency of D & C on November 4. We need not address the insolvency question since the cross-default clause provides a sufficient legal foundation for Mercantile's exercise of its right under the note to determine all obligations immediately due and payable. Since no challenge is made by appellees to the propriety of the cross-default clause, and there is no evidence that Mr. Chapel made any protest as to the contents of the September 14 note, D & C is bound by its provisions. *See Sullivan v. Mosner,* 266 Md. at 495 (1972).

The September 14 note also contained a set off clause, which follows:

> "Upon the occurrence of any default hereunder, Bank shall have the right immediately and without further action by it to set off against this Note all money owed by Bank in any capacity to each obligor, whether or not due; and Bank shall be deemed to have exercised such right of set off and to have made a charge against any such money immediately upon the occurrence of such default even though such charge is made or entered on the books of Bank subsequent thereto."

Appellees' position here and at trial, having never assumed that D & C's debts were due, did not question the propriety of Mercantile's alleged right to recover the debts through the use of a set off against the checking account. Their position has remained constant that the terms of the September 14 note were modified by the subsequent conduct of the parties and therefore was not due and payable when Mercantile exercised its right of set off as provided in the note itself. Since this particular point is not disputed by appellees, Md. R. 1085, we shall avoid the niceties of the law governing a bank's right to set off; suffice it to note that according to the Maryland cases Mercantile has a right to set off matured debts of a depositor against the depositor's checking account. *See Messall v. Suburban Trust*, 244 Md. 502, 510, 224 A.2d 419 (1966) (creditor permitted to set off accelerated debt); *see also Union Trust Co. v. Mullineaux*, 173 Md. 124, 194 A. 823 (1937); *Hayden v. Citizens National Bank of Baltimore*, 120 Md. 163, 87 A. 672 (1913); *First Denton National Bank v. Kenny*, 116 Md. 24, 81 A. 227 (1911); *Records v. McKim*, 115 Md. 299, 80 A. 968 (1911); *see generally*, 4 M.L.E., *Banks and Trust Companies*, § 118 (1960); 5A Michie, *Banks and Banking*, §§ 119b-120 (1973).

Having established the basic legality of Mercantile's set off of the defaulted note and installment loans against D & C's checking account, we shall now consider whether Mercantile's motion for a directed verdict on Counts One and Two should have been granted. This discussion will essentially resolve appellant's issues III and IV and we need not go any further.

## *Wrongful Dishonor*

Count One, which alleges Mercantile's wrongful dishonor of checks drawn on D & C's checking account, is premised upon the theory that the set off against the corporate checking account was improper. This, we have decided, was not the case. In reviewing the propriety of the denial of Mercantile's motion for directed verdict we must, of course, consider all evidence and inferences rationally drawn

therefrom in the light most favorable to the party against whom the motion is made. If there is in the record any legally relevant and competent evidence to prove the appellees' case then we must uphold the trial court's denial of the motion. *Boggs v. Citizens Bank & Trust Co.,* 32 Md. App. 500, 502, 363 A.2d 247 (1976). We find no such evidence here.

The Commercial Law Article of the Annotated Code of Maryland, (1975), § 4-402, (hereinafter UCC) sets forth the cause of action known as wrongful dishonor:

"§ 4-402. Bank's liability to customer for wrongful dishonor.

A payor bank is liable to its customer for damages proximately caused by the wrongful dishonor of an item. When the dishonor occurs through mistake liability is limited to actual damages proved. If so proximately caused and proved damages may include damages for an arrest or prosecution of the customer or other consequential damages. Whether any consequential damages are proximately caused by the wrongful dishonor is a question of fact to be determined in each case. (An. Code 1957, art. 95B, § 4-402; 1975, ch. 49, § 2.)"

A payor bank, in this instance Mercantile, generally has a duty to its customer to pay items "properly payable" and drawn against the customer's account. UCC §§ 4-401; 4-104 (1) (i). If this duty is breached, then the bank is liable to its customer for wrongful dishonor under § 4-402. Comment 2 of that section states, " 'Wrongful dishonor' excludes any permitted or justified dishonor ..." The actions taken by Mercantile amount to a permitted, rather than wrongful, dishonor. *Cf. Loucks v. Albuquerque Nat'l. Bk.,* 76 N.M. 735, 418 P.2d 191 (1966) (improper set off resulted in wrongful dishonor of plaintiff's checks); *see generally,* White & Summers, *Uniform Commercial Code,* § 17-4 (1972).

There were a total of twelve D & C checks which were allegedly dishonored by Mercantile. Of those twelve checks, nine were charged to D & C's account on November 4 and returned to the payees for non-sufficient funds on November

5. While the posting of an item (in this instance the entering of a debit to the customer's account), § 4-109 (d),[3] is a measuring point in the process of determining when an item may be finally paid, it does not mean that Mercantile's set off was too late to include those funds. See § 4-109 Comment. Mercantile's return of the nine checks is perfectly acceptable under § 4-301 which provides:

"(1) Where an authorized settlement for a demand item . . . received by a payor bank otherwise than for immediate payment over the counter has been made before midnight of the banking day of receipt the payor bank may revoke the settlement and recover any payment if before it has made final payment . . . and before its midnight deadline it

(a) Returns the item . . ."

Mercantile's charges against the account on November 4 used all available funds, thus the bank's return of the checks for what Mercantile termed "non-sufficient funds" amounted to a rightful dishonor since the set off was exercised prior to midnight of the banking day (November 5) following receipt of the checks on November 4. *See* § 4-104 (1) (h); *see generally,* White & Summers, *supra* at § 17-7 for an excellent discussion of this problem.

Of the three remaining checks dishonored, only the IRS check was included in the jury award. The IRS check for $8,247.58 was returned marked NSF (non-sufficient funds) on November 12. The saga of the IRS check is a little more complex than that of the other checks.

On November 11, 1974 John Chapel, Robert Powell, who was D & C's attorney, and Blake Hampson met at Powell's office to discuss the bank's charges against the account. Understandably concerned that the IRS would take action

---

**3.** Section 4-109 (d) provides in pertinent part:

"The 'process of posting' means the usual procedure followed by a payor bank in determining to pay an item and in recording the payment including one or more of the following or other steps as determined by the bank: (d) entering a charge or entry to a customer's account."

against D & C if the check, which was dated October 23, 1974 and sent to the IRS before the set off occurred, was not paid, John Chapel requested that the set offs be reversed immediately and the loans reinstated. While Hampson conceded no error on the part of the bank, he did agree to the bank's writing a letter to Mr. Powell stating that the bank would reverse their position on the installment loans and reinstate the $5,336.79, the pre-November 4 balance on the installment loans, in the checking account. According to Chapel's testimony Hampson represented that Mercantile's employees would monitor the account and the IRS check would not be rejected. The next day, November 12, the check was returned by Mercantile to the IRS. On November 13 Hampson stated to Chapel that the account was open and that checks would be honored. Chapel was notified by the IRS on November 14 that the check had been returned. The check was resubmitted to Mercantile by the IRS. Hampson called Chapel on November 19 and informed him that Mercantile had honored the IRS check on that day and that D & C's account would be overdrawn by $800 after the re-deposit of the installment loans. A letter, also dated November 19, from Hampson to Powell, informed Powell that the installment loans had been reinstated "as of this date". The credit to the account actually was made on November 21, 1974.

Our inquiry focuses upon the dishonor of the check on November 12. The checking account balance of November 12 was $954.22. Appellees argue that the balance should have been $6,292.01, representing the actual balance of $954.22 plus $5,337.79, the amount of the two installment loans, in other words, the reinstatement of the loans should have taken place immediately after the November 11 meeting. Appellees further contend that Mercantile had an obligation to reinstate that portion of the $3,575.83 (September 14 note) necessary to pay the IRS check. The answer quite simply to D & C's argument is that while Mercantile did agree to reinstate the amount of the set off attributable to the two installment loans as an accommodation to its customer, it never made any such agreement as to the September 14 note. Thus, even if the balance on November 12 had been $6,292.01, it would not have been sufficient to cover the face amount of the IRS check.

Appellees rely upon UCC § 4-401 (1) as authority for their position that the IRS check should have been drawn on insufficient funds. That section, which provides in pertinent part:

"As against its customer, a bank may charge against his account any item which is otherwise properly payable from that account even though the charge creates an overdraft.",

refers only to the bank's discretion in payment of items even though it creates an overdraft; it places no affirmative obligation upon the bank to pay the item. Thus, there was no evidence upon which a claim for wrongful dishonor of the IRS check could be based.

We therefore conclude that appellant's motion for directed verdict on Count One should have been granted.

### Conversion

We think it obvious at this juncture that neither D & C nor the individual plaintiffs have a cause of action in conversion of the checking account funds, since Mercantile's set off of the three obligations was lawful. Conversion necessarily involves the idea that the interference with another's property be wrongful, *Interstate Ins. Co. v. Logan,* 205 Md. 583, 588-89, 109 A.2d 904 (1954); *Gray v. Frazier,* 158 Md. 189, 192, 148 A. 457 (1930); *Western Md. Dairy v. Md. Wrecking & Equipment Co.,* 146 Md. 318, 327, 126 A. 135 (1924); *Kirby v. Porter,* 144 Md. 261, 266, 125 A. 41 (1923); *see generally,* 5 M.L.E., *Conversion,* § 24 (1960). Mercantile's actions simply cannot be characterized as anything but legal. The appellant's motion for directed verdict on Count Two was erroneously denied.

Having concluded that Mercantile's motion for directed verdict on Counts One and Two should have been granted, we see no necessity for reaching the other issues raised by Mercantile.

*Judgment reversed.*
*Costs to be paid by appellees.*