REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2965

September Term, 2010

PUBLISH AMERICA, LLP

v.

SALLY STERN A/K/A SALLY ANN
MIKETA STERN

Kehoe
Nazarian,
Kenney, James A., III
 (Retired, Specially Assigned),

JJ.

Opinion by Kenney, J.

Filed:  February 3, 2014

During a three-day trial in the Circuit Court for Frederick County on October 27-29, 2010, the court granted judgment as to liability in favor of Sally Stern, appellee and cross-appellant, on her complaint for breach of contract against Publish America, LLP ("Publish America"), appellant and cross-appellee, and a jury awarded damages of $10,880. Publish America presents one question,[1] and, Stern presents four questions for our review.[2] We have reworded those questions as follows:

- Did the circuit court err in granting judgment as to liability in favor of Stern?

- Did the jury err in its jury instructions and/or verdict sheet in regard to

---

[1]As stated in its brief, Publish America's question is:

> Whether the trial court properly granted judgment in favor of [Stern] (rather than granting judgment, judgment notwithstanding the verdict, or summary judgment in favor of [Publish America]) when the undisputed evidence proffered by [Publish America] established that (a) [Stern] failed to fictionalize the book as promised, (b) people were able to recognize characters in the book as real people, and (c) damages for lost profits were speculative.

[2]As stated in her brief, Stern's questions are:

> 1. Did the lower court err[] in denying Stern's motion to amend her pleadings to conform to the proof? Stern says "yes."
>
> 2. Did the lower court err in denying Stern's Motion for Costs? Stern says "yes."
>
> 3. Did the trial court err in denying Stern's Motion to Amend the *Ad Damnum* clause? Stern says "yes."
>
> 4. Did the trial court err by excluding Stern's expert? Stern says "yes."

damages?[3]

• Did the circuit court abuse its discretion in granting Publish America's Motion for Protective Order Quashing [Stern's] Notice of Deposition and to Exclude [Stern's] Expert from Testifying at Trial?

• Did the circuit abuse its discretion in denying Stern's Motion for Leave of Court to Amend the *Ad Damnun* Clause?

• Did the circuit court abuse its discretion in denying Stern's motion to amend the complaint to conform to the proof by adding a count "for tortious interference with a prospective economic advantage"?

• Did the circuit court abuse its discretion in denying Stern's motion for costs?

For the reasons that follow, we shall reverse the judgment of the circuit court.

**FACTUAL AND PROCEDURAL BACKGROUND**

While working as a librarian at the Ludington Library in Ludington, Michigan, Stern developed a manuscript for a book which she sought to have published.[4] She contacted

---

[3]This issue is not presented as a stand alone question in Publish America's "Questions Presented," but it is raised in the body of its brief. *See Janelsins v. Button*, 102 Md. App. 30, 35 (1994) ("Janelsins's actual Question Presented does not specifically mention consent or assumption of risk, but, in a generous reading of his brief, those issues appear in the argument section.").

[4]At trial, when asked by counsel what "possessed" her to seek publication, Stern replied:

> [O]ver the years I tried to let the director [of the library] know that not only were there pedophiles in the library, because I guess, there's no where else for them to go, I don't really know. And the children are not safe there, and many of our patrons were making other patrons uncomfortable by rubbing themselves, um, masturbating next to them, um, yelling and screaming curse words, uh, stalking children, and, uh, we have a, some terrorists come into the library. And every time I went to, um, to my director he said

(continued...)

2

Publish America, a publishing company. On February 7, 2008, Publish America offered to publish Stern's manuscript. In the offer email, Stern was "advise[d]" to "obtain written permission for all quotes used and for any real life individuals mentioned."[5]

Stern wrote back:

> I am not using any real names in this book. If I choose to categorize the book as fiction, would I still need to get written permission for all quotes? . . . [H]aving to have permission to repeat what someone has said to you seems like a massive effort to conceal the truth rather than protecting individuals.

Publish America responded that "you would not have to concern yourself with this if you were to label your book as fiction" and "fictionalize the work[.]"

On February 11, 2008, Stern emailed Publish America about how she could "go about

---

[4](...continued)
> that the patron would need to come to him with the complaint.

> *  *  *

> I guess I just felt that nothing was ever going to change, and no matter how many times I went to my director he . . . wasn't going to do anything. And I called the police numerous times about people and I could tell that that was making me very unpopular at work. Over the years I complained about incidents. You have to understand that everyone else is in the back so they don't see them, and they thought, and, um, most of the people who were either molested or bothered or, they weren't going to go [to] a director. How many, you know, fifth graders or high school girls are going to go [to] a director and say there's an old man out there that's stroking himself while I'm trying to do my homework.

[5]In an April 1, 2008 email, Publish America clarified that "[t]his permission should indicate that they are aware of what you are writing and that they permit you to print it for distribution and sale."

fictionalizing the book, simply call it fiction?" Publish America replied:

> [Y]ou would have to change the names of anyone mentioned by their real names in the book. You must market the book as fiction, and during the production process, a disclaimer will be inserted into your book informing the reader that all contents are fictional.

On February 13, 2008, Publish America and Stern executed an "Agreement."[6] It states, in pertinent part:

> 1. The Author grants and assigns to the Publisher during a period of seven years from the date of the signing of this agreement by both parties thereto the exclusive right to produce, publish, sell or export, or cause to be produced, published, sold or exported, the above work in book form.
>
> * * *
>
> 3. The Publisher agrees to cause all copies of the said literary work to be printed as the market demands, and agrees, furthermore, to cause the copies so printed to be bound, from time to time, in sufficient quantities to supply purchasers of the said literary work therewith.
>
> * * *
>
> 13. Publisher may, in its discretion and without cost to the Author, edit or revise the manuscript. It is specifically understood and agreed, however, that the Publisher shall make no major revisions, changes and/or alterations therein without first receiving written permission to do so, provided that Publisher reserves the right to delete, modify and/or make such editorial changes and/or revisions as it deems advisable in the event that the context, or implication, of any part of the said

---

[6] The Agreement admitted into evidence was signed by Jennifer Brenneman on behalf of Publish America, but not by Stern. At trial, however, Stern testified that she "signed" the Agreement, and the execution of the Agreement has not been challenged by either party.

literary work would, in Publisher's opinion, incite prejudice, or defame any group, or any member thereof, because of race, religion or nationality; or in the event that any part or parts of the said literary work may be considered, by the Publisher, to be against the public welfare. If the Author refuses to give Publisher permission to make any requested change or otherwise objects to any suggested change, Publisher may terminate this agreement at its discretion.

14. If, in the opinion of the Publisher, the manuscript of the said literary work requires editing or revision, Publisher may, in its discretion, direct Author to edit or revise the manuscript. Author shall make the changes suggested by Publisher or Publisher shall have the right to terminate the contract at its discretion.

* * *

24. When in the judgment of the Publisher, the public demand for the work is no longer sufficient to warrant its continued manufacture, the Publisher may discontinue further manufacture and destroy any or all plates, books, sheets and electronic files without any liability in connection therewith to the author. However, the Publisher agrees to notify the Author of such decision in writing, and will offer to transfer to the Author the work and its rights in the copyrights thereon, the plates (if any), the bound copies and sheet stock (if any) on the following terms F.O.B. point of shipment: the plates at their value for old metal, the engravings (to be used only in the work) at one-half (½) their original cost, the bound stock at one half (½) the list price, and the sheet stock at cost of gathering, folding, sewing and preparing for shipment, all without royalties. In the latter event, unless the Author shall, within 30 days, accept said offer and pay the amount set forth in said writing, the Publisher may dispose of the work, copyrights, plates, books, sheets and other property without further liability for royalties or otherwise.

* * *

27. The Author covenants and represents that the said literary work has not hitherto been published in book form; that it

contains no matter that, when published, will be libelous or otherwise unlawful, or which will infringe upon any proprietary interest at common law or statutory copyright; that the Author is the sole proprietor of the said literary work and has full power to make this grant and agreement, and that the said work is free of any lien, claim, charge or debt of any kind; and that the Author and his legal successors and/or representatives will hold harmless and keep indemnified the Publisher from all manner of claims, proceedings and expenses which may be taken or incurred on the ground that said work is subject to any such lien, claim, charge or debt, or that it is such violation, or that it contains anything libelous or illegal.

On March 2, 2008, Stern, responding to a questionnaire prepared by Publish America, characterized her manuscript as "either narrative non-fiction or current events[.]" After reviewing Stern's proposed manuscript, Publish America emailed Stern on April 1, 2008:

> After a review of your *non-fiction* manuscript in the text production department, we have discovered the following content issues that must be resolved before we move forward.
>
> Publish America advises that you discuss your use of quotes and presentation of real-life persons with a lawyer per paragraph 27 of the [Agreement], you will be liable for any infringements. . . .
>
> Here are the issues that must be addressed:
>
> **Permissions:**
>
> Publish America requests a copy of the expressed, written permissions you have obtained from the real-life persons you refer to or describe in your book. This permission should indicate that they are aware of what you are writing and that they permit you to print it for distribution and sale.
>
> OR, if you are unable to obtain such permissions,

Publish America requests that you revise your manuscript, and re-submit a novel that allows the book to truthfully state that "All characters in this book are fictitious, and any resemblance to real persons, living or dead, is coincidental."

(Emphasis added).

Stern replied, "I suppose my best option is to turn it into a novel," but, "the problem is, I have no idea how to turn this into a novel. . . . What parts of the [manuscript] are worrisome to Publish America?" Publish America responded:

The issues at hand are those of real-life people being disparaged and possibly recognizable within your community. You mention certain things about individuals that they might not want to put in print. Such as situations that may be embarrassing to the individual or illegal drug use. Here are two examples:

*Then Mr. Three Hats started following her around in the library. Diane finally exploded. I am surprised she didn't explode sooner. She demanded that something be done about the stalking and ogling. No one should have been permitted to stalk her. I had let my director know several times when men had made advances toward her and nothing was done. Then, when she finally did explode, Mr. Three Hats and Diane were told they couldn't be in the library at the same time. They had to split the day. Diane didn't agree with the new rule, so, she ignored it and visited the library when she wanted. The police were called. She was handcuffed and taken into custody. I don't know what happened to her. I don't know if charges were pressed, but she has never been in the library again (her choice) and will not speak to me when I see her.*

\* \* \*

*Mr. Waterman suffers from both shell shock and too much illegal drug use. He comes in pretty much daily. He takes our mass transit, Dial-A-Ride, into town, sits right next to my desk, and reads the papers, only he doesn't read them, he rhymes*

7

*them out loud.*

> Although you do not refer to these individuals by name, they are most likely recognizable by their eccentricities alone. There are privacy concerns.

Stern replied: "I just don't know how to make it fiction without rewriting the entire book & totally changing the complexion." Publish America replied:

> It seems your best bet may be to fictionalize as you cannot seem to obtain permissions from anyone. By fictionalizing you would need to make sure that all names, places, and events have been changed so you may truthfully comply with the following disclaimer:
>
> *"All characters in this book are fictitious, and any resemblance to real persons, living or dead, is coincidental."*
>
> You would not be required to obtain any permissions if the book was fictionalized.

On April 7, 2008, Stern emailed Publish America that she would fictionalize her manuscript. Publish America responded: "The main thing to remember when fictionalizing is to take care that there are no real-life people that are in the least bit recognizable. You can achieve this by making sure that you change all names, places and events in your text. You must also make sure that you remove any mention either in your manuscript, or on your back cover, that this book is based on a true story."

On April 24, 2008, after receiving a revised manuscript, Publish America emailed Stern asking her to "confirm" that the manuscript was "in compliance" with Paragraph 27 of the agreement, and that "[a]ll characters in this book are fictitious, and any resemblance

8

to real persons, living or dead, is coincidental." Stern replied, "yes and yes. They are fictitious."

Stern's manuscript was subsequently published as *The Library Diaries*, and several hundred copies were sold. On July 15, 2008, Stern received a letter from Robert Dickson, the Director of the Mason County District Library, suspending her from work. On July 25, 2008, Stern's employment at the library was terminated.

Thereafter, Publish America was alerted to several articles in the press regarding Stern's book.[7] Publish America determined that *The Library Diaries* should be "take[n] off the market," and contacted Lightning Source, its printer, to "stop orders from printing . . . ." According to one email from Publish America to Lightning Source,

> "The Library Diaries" . . . was originally published as a work of fiction by Publish America. At the time of publication, Publish America had no reason to believe that the work was defamatory.

> Subsequently, Publish America was notified that third parties might try to assert claims for defamation based upon the fictional content of the work.

On August 25, 2008, Publish America emailed Stern:

> As you know, there is a lot of public commentary about your

---

[7]These articles include: "Librarian writes tell-all book, gets fired," WorldNetDaily, August 23, 2008 and "Library worker fired for writing revealing book," WZZM 13 News, August 26, 2008, which were admitted into evidence; and "Director: Library Diaries Author Invaded Patrons' Privacy," website of the American Library Association, August 30, 2008, which Publish America sent to Stern as an example of an article relating to the book.

book. Some people are even calling it defamatory.[8] As a result, we have had to pull the book temporarily from the market while we investigate. We will likely be contacting you for help during this investigation. Pursuant to paragraph 27 of the contract, your assistance is mandatory.

Lightning Source put the book on "hold" on September 5, 2008.

On September 25, 2008, Publish America emailed Stern:

Based upon public statements that you have made since your book was placed on the market, we are no longer able to continue selling your book. The contract, however, including the indemnification clause, will remain in force. If you find another publisher interested in selling your book, let us know; we may be willing to transfer publishing rights.[9]

The book was "cancel[ed]" on October 1, 2008.

Subsequently, Stern contacted other publishers about publishing *The Library Diaries*, but was unable to find one willing to do so. In making contacts with other publishers, Stern stated that Publish America was "willing to let [her] out of my contract if [she] can find a new publisher[.]"

On March 10, 2009, Stern, by email, requested that Publish America, because it was

---

[8]At trial, Publish America's counsel stated that no defamation claims had been filed against it, "but at the time[] we took the book off the market we certainly were concerned that . . . 27 or 30 different people could sue us."

[9]Paragraph 1 of the Agreement gave Publish America, for seven years, "the exclusive right to produce, publish, sell or export, or cause to be produced, published, sold or exported," *The Library Diaries*. Paragraph 20 of the Agreement gave Publish America "the exclusive right for the duration of this Agreement to negotiate for the sale, lease, license or other disposition of [*The Library Diaries*] in all hard and/or soft cover or reprint editions in book form."

no longer publishing her book, release her from the Agreement.[10] Publish America responded:

> We are still in the process of evaluating your legal obligations to Publish America. As you know, you promised to indemnify Publish America from all legal claims arising from your book, *e.g.*, defamation and invasion of privacy. Since third parties have characterized your book as tortious, we need to investigate further before we terminate the contract. In all likelihood, we will not terminate the contract completely. While we may return your book rights to you voluntarily, we will likely insist that the indemnification and dispute resolution provisions remain enforceable. However, it will probably take us several more months to finish our investigation. Assuming we make an offer like this, *i.e.*, only partial termination of the contract, would you be amenable to that?

On February 7, 2010, Stern filed a First Amended Complaint for breach of contract against Publish America.[11] The complaint alleged that "the Agreement permits [Publish America] to cease manufacture of [*The Library Diaries*] *only* upon the exercise of its judgment that public demand for the work would no longer be sufficient to warrant publication," and that Publish America ceased publication without making such a finding, and notwithstanding the actual continued market demand for the book. (Emphasis added). Furthermore,

> even if [Publish America] had made a finding that requisite market demand for "The Library Diaries" did not exist, . . . [Publish America] would have still materially breached the

___

[10]Stern testified that, in this email, she was "asking to be let out of the contract and have my publishing rights returned."

[11]The original complaint was filed on August 24, 2009.

> Agreement by, *inter alia*, failing to offer to transfer to [Stern] her work and her rights in the copyright thereon, the plate, the bound copies and sheet stock, and engravings[.]

The complaint sought "compensatory," "consequential," "incidental," and "punitive" damages "in the amount in excess of $30,000" resulting from Stern's "lost revenues from the sale of the book, lost opportunities for capturing those sales, and other potential profits as contemplated in the Agreement."

Publish America made a motion for summary judgment before trial, a motion for judgment at the end of trial, and, later, a motion for judgment notwithstanding the verdict and for a new trial. In its motion for judgment, Publish America's counsel stated: "the discontinuation [of publication] was based on paragraph 24" of the Agreement, *i.e.*, lack of demand. "But the reason why [Publish America] didn't return the rights was based upon [Stern's] breach of paragraph 14" of the Agreement, *i.e.*, the failure to fictionalize would excuse any breach by Publish America.[12] Counsel continued:

> if a contract states a remedy, the only way that they're bound to follow that specific remedy in all circumstances is if it says that's the exclusive remedy. And if you look at the contract here there's nothing in the language of paragraph 14 that says Publish America is limited to that specific remedy. In fact, it says at its discretion. So it may terminate, but it may, at its discretion, do something else. And in that case, Publish America decided not to terminate according to the contract, but to . . . cease performance.

---

[12]Citing *Maslow v. Vangrui*, 168 Md. App. 298 (2006), Publish America stated in a pre-trial a motion that, "[u]pon a material breach" by one party the other "party may rescind or may refuse further performance and sue for breach," and that Publish America "chose the latter option here by refusing to continue sale" of *The Library Diaries*.

12

These motions were denied.[13] After pondering "[w]hat does fictionalize mean under publishing terms?," the court stated, as to Publish America's motion for judgment:

> I certainly can't find as a matter of law that she breached . . . the contract in this case, quite truthfully, there's not enough evidence to submit the issue to the jury . . . as to whether or not she committed a breach as to whether or not she fictionalized or didn't fictionalize. . . . I don't think a lay person can testify as to whether or not it was fictionalized.

Stern made her own motion for judgment, based on Publish America's alleged disingenuous finding of lack of market demand, and its failure to return the publishing rights. Finding "as a matter of law," that "what Publish America decided to do was terminate" under paragraph 24 of the Agreement, the trial court granted Stern's motion "on the issue of liability," because Publish America did not "offer" to "return" the publishing rights to *The Library Diaries* to Stern, as was required under paragraph 24 of the Agreement.[14] The court sent to the jury the issue of damages for the time from contract termination until the rights were returned. The jury awarded Stern $10,880 in damages.

## Discussion

On appeal, Publish America argues that the circuit court erred in granting Stern's motion for judgment as to liability, and therefore, the circuit court also erred in not entering

---

[13]The motion for summary judgment and judgment notwithstanding the verdict were denied without a hearing.

[14]At trial, Publish America's counsel said that "we're willing to stipulate that we didn't return the rights." After the court granted motion for judgment in favor of Stern, Publish America agreed to return the rights before arguing the issue of damages.

summary judgment, judgment, or judgment notwithstanding the verdict in favor of Publish

America.

Maryland Rule 2-519 ("Motion for Judgment") states, in pertinent part:

> **(a) Generally.** A party may move for judgment on any or all of the issues in any action at the close of the evidence offered by an opposing party, and in a jury trial at the close of all the evidence. The moving party shall state with particularity all reasons why the motion should be granted. No objection to the motion for judgment shall be necessary. A party does not waive the right to make the motion by introducing evidence during the presentation of an opposing party's case.

> **(b) Disposition.** When a defendant moves for judgment at the close of the evidence offered by the plaintiff in an action tried by the court, the court may proceed, as the trier of fact, to determine the facts and to render judgment against the plaintiff or may decline to render judgment until the close of all the evidence. When a motion for judgment is made under any other circumstances, the court shall consider all evidence and inferences in the light most favorable to the party against whom the motion is made.

"Where . . . the trial is held before a jury, 'other circumstances' exist and the trial court must

'consider all evidence and inferences in the light most favorable' to the non-moving party."

*Hardy v. Winnebago Indus., Inc.*, 120 Md. App. 261, 269 (1998).

In regard to the applicable appellate review, the Court of Appeals has said:

> We review the trial court's grant of [a] motion for judgment *de novo,* considering the evidence and reasonable inferences drawn from the evidence in the light most favorable to the non-moving party. . . . It is only when the "facts and circumstances only permit one inference with regard to the issue presented," that the issue is one of law for the court and not one of fact for the jury. An appellate court must review the grant or denial of a motion

14

for judgment by conducting the same analysis as the trial judge.

*Thomas v. Panco Mgmt. of Maryland, LLC*, 423 Md. 387, 393-94 (2011) (internal citations omitted). Put another way, "if there is any evidence, no matter how slight, that is legally sufficient to generate a jury question, the case must be submitted to the jury for its consideration." *Tate v. Bd. of Educ., Prince George's Cnty.*, 155 Md. App. 536, 545 (2004) (citation omitted). Publish America contends that Stern, by failing to adequately revise and fictionalize *The Library Diaries*, committed a material breach of paragraph 14 of the Agreement that required the author to "make the changes suggested by Publisher." Therefore, under common law principles of contractual breach and performance, Publish America was excused from any obligation it had to return the publishing rights under paragraph 24 of the Agreement. Publish America specifically assigns error to the circuit court's determination that

> I certainly can't find as a matter of law that [Stern] breached . . . the contract in this case, quite truthfully, there's not enough evidence to submit the issue to the jury . . . as to whether or not she committed a breach as to whether or not she fictionalized or didn't fictionalize. . . . I don't think a lay person can testify as to whether or not it was fictionalized.

Publish America contends that the court's decision was "wrong" because, "[w]hen deciding whether real persons are recognizable in the book, the fact finder is required to examine whether the <u>readers</u> or <u>audience</u>, *i.e.*, the people who know about the events, would recognize the persons depicted in the book." As we understand Publish America's contention, it offered "legally sufficient" evidence to generate a "jury question" as to whether or not Stern

15

fictionalized *The Library Diaries*.[15]

Stern responds that by "advis[ing]" her "about the process of fictionalization" and "recommend[ing] specific changes," Publish America, by publishing the book, "either waiv[ed the] requirement of fictionalization or [was] satisfied Stern had sufficiently done so." In Stern's view, Publish America "was under no delusion [that] Stern's vignettes were based upon characters other than those derived from her experiences."

Publish America's concern with the fictionalization of *The Library Diaries* rests on the premise that, ordinarily, a fictitious person cannot be defamed. Indeed, "in order to maintain an action for libel or slander, it must appear that the defamatory words refer to some ascertained or ascertainable person, and that person must be the plaintiff.'" *Great Atl. & Pac. Tea Co. v. Paul*, 256 Md. 643, 651 (1970) (quoting *Nat'l Shutter Bar Co. v. C.F.S. Zimmerman & Co.*, 110 Md. 313 (1909)). More specifically, § 564(d) of the Restatement (Second) of Torts states,

_____

[15]Publish America also contends that, because it was the "sole arbiter" of whether, under paragraph 24 of the Agreement, "public demand for the work [was] no longer sufficient to warrant its continued manufacture," Stern failed to establish a breach of contract. Because the circuit court found a breach based only on the failure to return the publishing rights, we do not address this argument.

Publish America further argues that: (1) because Stern "tricked" it into publishing a non-fiction book, she should not be entitled to "benefits" under paragraph 24 of the Agreement, *i.e.*, return of the publishing rights; (2) Publish America "was entitled to retain some control over the literary rights" in order to minimize its potential exposure to defamation claims; and (3) it was not obliged to terminate the agreement because to do so would "excuse[]" Stern "from defending [Publish America] under the indemnification clause even though she had exposed [Publish America] to the liability against which it needed indemnification."

A libel[16] may be published of an actual person by a story or essay, novel, play or moving picture that is intended to deal only with fictitious characters if the characters or plot bear such a resemblance to actual persons or events as to make it reasonable for its readers or audience to understand that a particular character is intended to portray that person. Mere similarity of name alone is not enough; nor is it enough that the readers of a novel or the audience of a play or a moving picture recognize one of the characters as resembling an actual person, unless they also reasonably believe that the character is intended to portray that person. . . .[17] The fact that the author or producer states that his work is exclusively one of fiction and in no sense applicable to living persons is not decisive if readers actually and reasonably understand otherwise. Such a statement, however, is a factor to be considered by the jury in determining whether readers did so understand it, or, if so, whether the understanding was reasonable.

The Restatement provides the following "illustration":

The A motion picture producing company produces a film based upon historical events but offered as a fictitious play. In the film, B, a young woman who was a participant in some of these events, is represented as having yielded to the hypnotic power of the villain. In spite of the deviations of the film from the exact historical facts, B's friends reasonably understand that she is portrayed in the picture. The film is defamatory of B.

---

[16] "Libel and slander are two branches" of the tort of defamation, *Lake Shore Investors v. Rite Aid Corp.*, 67 Md. App. 743, 752 (1986), the difference being that, ordinarily, "slander refers to words which are spoken while libel refers to words which are written," *Cant v. Bartlett*, 292 Md. 611, 622 (1982), although slander may also encompass the written word. *See generally* 292 Md. 611. "But their essential elements are the same, and in many instances, it does not make any difference in which form plaintiff elects to cast his complaint." *Lake Shore Investors*, 67 Md. App. at 752.

[17] "'The test is whether persons who knew or knew of the plaintiff could reasonably have understood that the fictional character was a portrayal of the plaintiff.' 'It is not necessary that all the world should understand the libel; it is sufficient if those who knew the plaintiff can make out that [the plaintiff] is the person meant.'" *Smith v. Stewart*, 291 Ga. App. 86, 92 (2008) (internal citations omitted).

Publish America was not required to call an expert witness to establish what is essentially a question of fact and the court erred in granting Stern's motion for judgment. In our view, the evidence submitted at trial was sufficient[18] to have the jury decide whether certain characters were reasonably identifiable individuals within the Ludington community. Specifically, Stern testified that Ludington library patrons included a man who brought empty gallon jugs to the library to fill with water, a girl who carried a stuffed purple dinosaur, a man who wore three hats at once, and a woman from Norway who had an altercation with this three-hatted man and was arrested as a result. *The Library Diaries* includes characters with these distinct traits. In addition, the book cover includes a picture of the actual Ludington Library. The story takes place in Michigan and refers to Dial-a-Ride, a car service found in Ludington, a retirement community across the street from the Library called "The Towers," which is the name of a retirement community across the street from the Ludington Library, and a "Jabovy" street, a street also found in Ludington. Miranda Prather, an executive director at Publish America, testified that she read an article quoting Stern's supervisor at the Library, Mr. Dickson, that the characterizations in *The Library Diaries* were very recognizable as people within their community. Moreover, Stern testified that her reason for writing *The Library Diaries* was to draw attention to specific incidents occasioned by

---

[18]The test for legal sufficiency of the evidence is whether "some evidence in the case, including all inferences that may be permissibly drawn therefrom, that if believed and if given maximum weight, could logically establish all of the elements necessary to prove that . . . the tort tortfeasor committed the tort. *Starke v. Starke*, 134 Md. App. 663, 678-79 (2000).

particular patrons of the Ludington Library and the director's failure to address her concerns. When asked what she did to fictionalize the book, Stern testified that she merely created a pen name and introduced two protagonists so it would not appear that the book was written by her.

The court denied Publish America's proffer to introduce Mr. Dickson's testimony into evidence on the basis that a lay person could not testify whether a book was fictionalized. Publish America's counsel proffered that Mr. Dickson was "going to testify that he recognized . . . events . . . and places, and that he was able to . . . associate a name with certain people." The denial of Mr. Dickson's testimony on the basis that he was not an expert was error, and his testimony would have been relevant to help the jury decide whether readers could reasonably understand that the fictional characters were actually portrayals of real and identifiable people living in the Ludington community.

The circuit court, by its finding that there was not enough evidence to support Publish America's position that Stern failed to fictionalize *The Library Diaries*, effectively short-circuited Publish America's defense that any breach of the Agreement was excused by Stern's own material breach.[19] Whether a breach is considered material is a question of fact,

---

[19]"[U]nder Maryland law, a party suing on the contract must first prove his own performance, or an excuse for nonperformance, in order to recover for any breach by the opposing party." *Hubler Rentals, Inc. v. Roadway Exp., Inc.*, 637 F.2d 257, 260-61 (4th Cir. 1981) (citations omitted). The Court of Appeals has said that when "there has been a material breach by one party, the other party has the right to rescind." *Plitt v. McMillan* , 244 Md. 450, 454 (1966). More specifically:

(continued...)

19

unless the question is "so clear that a decision can properly be given only one way, and in such a case the court may properly decide the matter as if it were a question of law." *Speed v. Bailey*, 153 Md. 655, 661-62 (1927) (quoting Williston on Contracts, sec. 866). It is not so clear in this case because the failure to adequately fictionalize the work could be considered a material breach of the Agreement and no specific remedy is provided for breach of paragraph 27, so common law remedies were available to Publish America if Stern breached that paragraph of the Agreement. *See Massachusetts Indem. & Life Ins. Co. v. Dresser*, 269 Md. 364, 369-70 (1973) ("'Although the parties may, in their contract, specify

---

[19](...continued)
> It is not every partial failure to comply with the terms of a contract by one party which will entitle the other party to abandon the contract at once. In order to justify an abandonment of it and of the proper remedy growing out of it, the failure of the opposite party must be a total one – the object of the contract must have been defeated or rendered unattainable by his misconduct or default. For partial derelictions and nonperformance in matters not necessarily of first importance to the accomplishment of the object of the contract, the party injured must seek his remedy upon the stipulations of the contract itself. Before partial failure of performance of one party will give the other the right of rescission, the act failed to be performed must go to the root of the contract, or the failure to perform the contract must be in respect to matters which would render the performance of the rest a thing different in substance from that which was contracted for. When a covenant goes only to a part of the consideration of a contract, is incidental and subordinate to its main purpose, and its breach may be compensated in damages, such a breach does not warrant a rescission of the contract, but the injured party is still bound to perform his part of the agreement, and his only remedy for the breach consists of the damages he has suffered therefrom.

*Barufaldi v. Ocean City*, 196 Md. App. 1, 20 (2010) (quoting *Speed v. Bailey*, 139 A. 534, 536 (Md. 1927).

a remedy for a breach thereof, that specification does not exclude other legally recognized remedies. A contract will not be construed as taking away a common-law remedy unless that result is imperatively required.'") (quoting 17 Am.Jur. 2d Contracts s 445 at 906 (1964)).

On the other hand, whether Publish America waived or is precluded from defending on the requirement of fictionalization, as Stern argues, would also be a question for the jury. *See Mercantile-Safe Deposit & Trust Co. v. Delp & Chapel Concrete & Constr. Co.*, 44 Md. App. 34, 41-42 (1979) (whether "subsequent conduct of parties amounts to a modification or waiver of their contract . . . is generally a question to be decided by the trier of fact).

In sum, the judgment in favor of Stern on the issue of liability was granted in error. Accordingly, we shall reverse the damages judgment in favor of Stern.

As a result, we need not address in any detail the questions presented by Publish America and Stern because they are unlikely to occur in the event of a new trial, which would have resulted were we to resolve Stern's questions in her favor. If there is to be a new trial, there will be a new scheduling order that will present the opportunity for the necessary amendment of pleadings. Timely compliance with that scheduling order by both parties would avoid the need for late filed motions as occurred in the first trial.

As to Stern's Motion for Costs, to the extent it is grounded in the judgment in her favor on the issue of liability, it is undermined by our decision reversing that judgment and the resulting award of damages. Thus, Stern, at this juncture, in the litigation, is not the prevailing party. That said, "the allowance" or disallowance of costs is "clearly within the

21

sound discretion of the trial court" and will be reviewed by an appellate court for abuse of discretion. *Sinclair Estates, Inc. v. Charles R. Guthrie Co.*, 223 Md. 572, 575 (1960).

Maryland Rule 2-603 states, in pertinent part:

> (a) **Allowance and allocation.** Unless otherwise provided by rule, law, or order of court, the prevailing party is entitled to costs. The court, by order, may allocate costs among the parties.
> (b) **Assessment by the Clerk.** The clerk shall assess as costs all fees of the clerk and sheriff, statutory fees actually paid to witnesses who testify, and, in proceedings under Title 7, Chapter 200 of these Rules, the costs specified by Rule 7-206(a). On written request of a party, the clerk shall assess other costs prescribed by rule or law. The clerk shall notify each party of the assessment in writing. On motion of any party filed within five days after the party receives notice of the clerk's assessment, the court shall review the action of the clerk.
> (c) **Assessment by the Court**. When the court orders or requests a transcript or, on its own initiative, appoints an expert or interpreter, the court may assess as costs some or all of the expenses or may order payment of some or all of the expenses from public funds. On motion of a party and after hearing, if requested, the court may assess as costs any reasonable and necessary expenses, to the extent permitted by rule or law.

We perceive no abuse of discretion in denying this motion that included postage, photocopying, parking, fuel, and meals at Starbucks and at McDonald's.

**JUDGMENT OF THE CIRCUIT COURT FOR FREDERICK COUNTY REVERSED. COSTS TO BE PAID BY APPELEE/CROSS-APPELLANT.**

22