REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1988

September Term, 2014

———————————————————

BOSTON SCIENTIFIC CORPORATION, ET AL.

v.

MIROWSKI FAMILY VENTURES, LLC

———————————————————

Wright,
Nazarian,
Eyler, James R.
 (Retired, Specially Assigned),

JJ.

———————————————————

Opinion by Wright, J.

———————————————————

Filed: January 29, 2016

This appeal rises from the judgment of the Circuit Court for Montgomery County in favor of the appellee-plaintiff, Mirowski Family Ventures, LLC ("MFV"),[1] against appellant-defendant, Boston Scientific Corporation ("BSC"), in the amount of $86,536,857.00 for royalties owed for 2002 and 2003, $142,612,000.00 for damages in an Indiana lawsuit, and $80,200,000.00 for damages in a Delaware lawsuit. BSC presents these questions for review:

1. Whether the circuit court erred in granting summary judgment that BSC had breached the "right to participate" provision of the 2004 License Agreement despite genuine dispute of material facts.

2. Whether the circuit court erred in its interpretation of the "mutual agreement" provision of the 2004 License Agreement and in arriving at such an interpretation despite determining that the provision was ambiguous.

3. Whether the circuit court erred in allowing the unsubstantiated testimony of Roderick McKelvie in support of MFV's Improper Agreement claim and in denying BSC's JMOL and JNOV motions as to that claim, which were made on the ground that the claim depended on Mr. McKelvie's unsubstantiated testimony.

4. Whether the circuit court erred in excluding evidence of St. Jude's invalidity defenses in the St. Jude Delaware litigation and whether, as result, the jury's verdict in damages award on the Delaware component of MFV's Improper Agreement claim should be vacated.

5. Whether the circuit court erred in allowing the "reasonable settlement" damages opinion of Dr. Mohan Rao, which failed to take into account St. Jude's settlement positons in the St. Jude Indiana and St. Jude Delaware Litigations; and whether, as a result, the jury's damages awards for the Improper Agreement claim should be vacated.

---

[1] MFV is a Maryland Limited Liability Company.

6. Whether the jury's damages award for the Improper Agreement claim should be vacated because they relied on premises that contradicted the historical record of the St. Jude Indiana and St. Jude Delaware Litigations.

7. Whether judgment should be entered in BSC's favor with respect to MFV's Accrued Royalties claim because the primary theory on which MFV relied was legally erroneous.

8. Whether the jury's verdict with respect to MFV's Accrued Royalties claim should be vacated because of the circuit court's erroneous rulings on the patent law issues on which MFV's alternative theories depended, including the circuit court's refusal to instruct the jury on issues of patent law.

9. Whether the circuit court erred in deciding as a matter of law prior to trial that MFV was entitled to "accrued royalties" for overseas sales of ICDs in contravention of Federal Circuit precedent.

For the reasons discussed below, we affirm the circuit court.

**FACTS AND PROCEDURAL HISTORY**

## I.      Patent origins and the BSC license agreements

Dr. Michel Mirowski developed an implantable cardiac defibrillator ("ICD"), a device that is implanted in the body and capable of preventing sudden cardiac death. Since the first patient received the ICD in 1980, millions of others have had the device implanted. Later on, cardiac resynchronization therapy ("CRT"), building on the ICD technology, was invented to treat congestive heart failure. Dr. Mirowski, and through what later became MFV, owned the patents to both inventions: the ICD[2] is covered by

_____

[2] The ICD is patented as an "implantable heart stimulator and stimulation method."

2

patent 4,407,288 ("the '288 patent"), and the CRT technology is covered by patent RE38,119 ("the '119 patent").

MFV originally licensed the two patents exclusively to Guidant, a corporate entity later acquired by BSC, in 1973 ("1973 License Agreement"). The licenses were then restated in 2004 ("2004 License Agreement"). The licenses gave Guidant (and subsequently BSC) the rights to sublicense any or all of the MFV patents on its own terms, as long as MFV received a 3% royalty on the initial sale as well as the sale of covered products. Guidant also received "the right to bring and conduct suit or actions in its name against others for infringement of any [licensed] patent . . . , the same as if such patent were the exclusive property of GUIDANT." Importantly, the license agreement reserved for MFV certain litigation rights:[3] (1) BSC must obtain MFV's "mutual agreement" to "bring or conduct" litigation;[4] (2) MFV has the "right to participate" in litigation; and (3) MFV and BSC must "divide [] equally" any proceeds of infringement litigation.

## II.     Lawsuits against St. Jude

---

[3] BSC was the manufacturer of the products and thus was the only party that could bring a claim for lost profits. As a result, MFV's interests in litigation for infringement of its patents were tied to BSC's. *See Wechsler v. Macke Int'l Trade, Inc.*, 486 F.3d 1286, 1293 (Fed. Cir. 2007) ("Normally, if the patentee is not selling a product, by definition there can be no lost profits.") (Citation omitted).

[4] The circuit court defined this obligation to mean that BSC "must seek Mirowski's agreement to an important litigation decision, including any settlement that could affect Mirowski's patent rights, before taking action." It added that BSC "must consult with and advise Mirowski of its intentions at such a time and under such circumstances that would enable Mirowski to take action to protect itself, if it chooses to do so."

3

### a. St. Jude litigation in Indiana regarding the '288 patent

In 1996, Guidant[5] and MFV, as joint plaintiffs, through mutual agreement, sued

St. Jude in Indiana federal court for selling ICD devices without a sublicense for the

patents ("St. Jude Indiana Litigation"). The jury returned a verdict in favor of Guidant

and MFV for the sum of $140 million, finding that St. Jude had infringed the '288 patent.

The trial judge reversed the jury verdict on motion for judgment notwithstanding the

verdict ("JNOV"), ruling that the patent was invalid.

Guidant and MFV mutually agreed to appeal the court's decision as to a key

"method claim"[6] of the '288 patent ("Claim 4").[7] While the St. Jude Indiana Litigation

---

[5] Guidant, the predecessor-in-interest to BSC, was headquartered in Indiana.

[6] Unlike a claim that would cover a device or apparatus, "a method claim is not directly infringed by the sale of an apparatus even though it is capable of performing only the patented method. A sale of the apparatus is not a sale of the method. A method claim is *directly* infringed only by one practicing the patented method." *Joy Techs., Inc. v. Flakt, Inc.*, 6 F.3d 770, 774-75 (Fed. Cir. 1993) (emphasis in original).

[7] Claim 4 of the '288 patent, and claim 1 on which it depends, states:

1. A method of heart stimulation using an implantable heart stimulator capable of detecting a plurality of arrhythmias and capable of being programmed to undergo a single or multi-mode operation to treat a detected arrhythmia, corresponding to said mode of operation the method comprising the steps of:
   (a) determining a condition of the heart from among a plurality of conditions of the heart;
   (b) selecting at least one mode of operation of the implantable heart stimulator which operation includes a unique sequence of events corresponding to said determined condition; and
   (c) executing said at least one mode of operation of said implantable heart stimulator thereby to treat said determined heart condition.

*    *    *

was on appeal, Guidant and MFV entered into an agreement ("the 2004 Royalty Agreement") in which Guidant "suspended payment of royalties on products covered by the '288 Patent pending the outcome of the appeal." The agreement then outlined: (1) if there is a "final non-appealable judgment" that the '288 patent was valid and St. Jude did infringe upon it, Guidant would pay MFV "a sum equal to all royalties that accrued pursuant to the License Agreement on products covered by any such claims" from the date the royalties were suspended until they became reinstated, along with interest at the prime rate;[8] and (2) if the Federal Circuit found that St. Jude did not infringe the '288 patent, Guidant would pay MFV a flat sum of $15 million. In August 2004, the appellate court remanded the St. Jude Indiana case, holding that the '288 patent was not invalid. On remand, the district court found that at least some St. Jude devices were used according to the patented method, but limited damages to only those devices that were proved to have infringed on the patented method, not on every device capable of performing the patented method.

### b. St. Jude Litigation in Delaware Regarding the '119 Patent

Guidant and MFV brought a second suit against St. Jude in the U.S. District Court for the District of Delaware for allegedly infringing the '119 patent ("the St. Jude

---

4. The method of claim 1, wherein at least one mode of operation of said implantable heart stimulator includes cardioversion.
*Boston Scientific Corp. v. Mirowski Family Ventures, LLC* ("BSC 2013"), No. 1:11-CV-736-WTL-DKL (S.D. Ind. Feb. 13, 2013).

[8] Guidant set up an account for royalty payments for all the ICDs it sold during this period.

Delaware case") in 2004. After two years, the parties completed fact discovery but the issues in dispute had not been considered by the court.

### III. BSC acquires Guidant and Settles with St. Jude

In April 2006, BSC completed its purchase of Guidant and became the exclusive licensee to the MFV patents. BSC then began discussing a settlement with St. Jude ("the BSC-St. Jude Settlement") that included not only unresolved issues from the St. Jude Delaware case and the St. Jude Indiana Litigation, but also "a number of other cases in which BSC was adverse to St. Jude." MFV asserts that these were cases "that presented a serious risk to BSC and had nothing to do with Mirowski." The parties disagree as to whether MFV was given sufficient notice of the BSC-St. Jude Settlement discussions.[9] Although MFV claims the BSC-St. Jude Settlement discussions were held in secret, MFV also met with St. Jude to discuss the Indiana and Delaware cases, but a settlement was never reached between the two parties. MFV maintains that as a result of its failed negotiations with St. Jude, it "believed settlement with St. Jude was off the table," and was thus surprised to hear of the BSC-St. Jude Settlement.

---

[9] MFV contends that "BSC did not notify Mirowski of the negotiations or propose settlement terms until *after* BSC and St. Jude signed the BSC-STJ Settlement on July 29, 2006." BSC, however, claims that "[s]hortly [after acquiring Guidant], BSC notified MFV that it was in discussions with St. Jude concerning settlement and urged MFV and St. Jude to reach their own agreement."

The BSC-St. Jude Settlement dismissed four pending litigations by St. Jude against BSC in exchange for the value of the Indiana and Delaware cases.[10] MFV claims that a BSC expert valued the damages in the St. Jude Delaware case at at least $131 million before the BSC-St. Jude Settlement, and then after the settlement at only $16.8 million. MFV asserts that the "87% drop in damages [] was directly attributable to the BSC-STJ Settlement."

MFV continued with the Delaware and Indiana cases against St. Jude. In July 2007, MFV and St. Jude settled the Delaware case for $35 million dollars. The Indiana case continued until 2009, when the Federal Circuit again concluded that the '288 patent was not invalid and that St. Jude had infringed it, and MFV settled the remnants for $1.9 million.

## IV.    Litigation between BSC and MFV

After learning of the BSC-St. Jude Settlement, MFV informed BSC that BSC had breached the 2004 License Agreement because (1) the separate negotiations deprived MFV of the "right to participate" in the St. Jude litigations and caused damages, and (2) BSC failed to obtain MFV's "mutual agreement" before entering into the BSC-St. Jude settlement. Further, BSC did not pay MFV the amount of royalties agreed upon in the 2004 Royalty Agreement that determined what BSC owed MFV at the end of the St. Jude Indiana Litigation. Because the '288 patent was deemed valid and St. Jude found to have

---

[10] In the BSC-St. Jude settlement, BSC agreed to only pursue certain damages, forgo certain damages, and cap the royalty fee at 3%. BSC also agreed not to introduce certain evidence against St. Jude.

infringed upon it, BSC owed MFV "a sum equal to all royalties that accrued" between 2002-2003, plus interest. While both parties agreed that "the sum" plus interest equaled over $86.5 million dollars, BSC paid MFV only $6.7 million of this amount. BSC based this amount on its interpretation that royalties were due only the percentage of St. Jude devices that allegedly infringed the '288 patent in the St. Jude Indiana Litigation, excluding royalties on devices and accessories that BSC had paid in the past pursuant to the 2004 License Agreement.

### i. BSC sues MFV for declaratory judgment in Indiana Federal Court

On May 31, 2011, Boston Scientific filed its "Complaint for Declaratory Judgment" seeking declaratory judgments that, among other things, the payments it had made to MFV satisfied its royalty obligations under the 2004 License Agreement. After several pre-trial motions, BSC brought to the court's attention *Gunn v. Minton*, 133 S.Ct. 1059 (2013), a Supreme Court decision handed down while the parties were preparing for trial. *Gunn* limited the jurisdiction of federal courts to hear certain cases pertaining to patent law. BSC "suggested that, pursuant to [the] holding [in *Gunn*], the [Indiana District] Court lacked subject matter jurisdiction over this case." *Mirowski Family Ventures, LLC v. Bos. Sci. Corp.*, 958 F. Supp. 2d 1009, 1010 (S.D. Ind. 2013). [11] The

---

[11] Both BSC and MFV invoked the district court's jurisdiction under 35 U.S.C. § 1338, which gave the federal courts *exclusive* jurisdiction over claims whose resolutions turned on patent law issues, even where the underlying claims were based in contract or tort law. *Gunn*, 133 S. Ct. at 1068, held that § 1338 does not deprive state courts of subject matter jurisdiction, thereby eliminating the exclusive jurisdiction of federal courts over cases involving patent claims. Without § 1338, a federal court could not hear the case between MFV and BSC because there was no federal question nor diversity of citizenship.

district court agreed and dismissed the case for lack of subject matter jurisdiction. *Id.* at 1018.

### ii. MFV commences litigation in Montgomery County.

MFV filed the suit from which this appeal arises in the Circuit Court for Montgomery County after BSC argued that the Indiana District Court lacked jurisdiction, and the Montgomery County case proceeded after the federal case was dismissed. Prior to trial, the circuit court granted MFV's motion for summary judgment that BSC breached MFV's "right to participate" as outlined in the 2004 Royalty Agreement. After three weeks of trial, the jury returned a verdict in favor of MFV. On the claim of royalties owed, the jury awarded MFV the full stipulated value of $86.5 million; on the claim for breach of the 2004 License Agreement related to the BSC-St. Jude Settlement, the jury returned a verdict for less than MFV requested, but still amounting to $222 million for both the Delaware and Indiana cases.

Additional facts will be included in the discussion as they become relevant.

## Discussion

### I. The circuit court committed no errors with respect to the "Improper Agreement" claim.

#### a. The circuit court appropriately granted partial summary judgment in favor of MFV that BSC breached the "right to participate" provision of the 2004 License Agreement.

BSC avers that the circuit court wrongly granted partial summary judgment in MFV's favor when it ruled that there was no genuine dispute of material fact as to whether the July 2006 Agreement between BSC and St. Jude violated MFV's contractual

9

"right to participate."[12]   The reviewing court reviews an order granting summary

judgment *de novo*, conducting "an independent review of the record to determine if there

is a dispute of material fact." *Injured Workers' Ins. Fund v. Orient Exp. Delivery Serv.,*

*Inc.*, 190 Md. App. 438, 450-51 (2010) (citation omitted).

In our review of the granted summary judgment, we must "examine the same

information from the record and determine the same issues of law as the trial court." *La*

*Belle Epoque, LLC v. Old Europe Antique Manor, LLC*, 406 Md. 194, 209 (2008)

(citation omitted).  We therefore "only look to the evidence submitted in opposition and

support of the motion for summary judgment in reviewing the trial court's decision to

grant the motion." *Id.* (citations omitted).  In its brief, however, BSC relies entirely on

the evidence presented during the trial.  Because we must examine the information the

circuit court relied on to make its decision, evidence from the trial is not relevant to our

review.  While the volumes of record extract contain the transcript of the hearing before

the circuit court regarding summary judgment as well as BSC's opposition brief to

MFV's motion for partial summary judgment, those extracts alone do not place us in an

adequate position to review the record *de novo*.  *See Boland v. Boland*, 423 Md. 296, 366

(2011) (explaining that an appellate court must "independently review the record to

determine whether" a dispute of material fact exists).  BSC, as the appellant, is tasked

---

[12] Section 2 of Article VII of the 2004 License grants MFV the following:

"MIROWSKI shall have the right to participate in any infringement suit or
action brought by [BSC] under the terms of the Exclusive License
Agreement."

10

with the responsibility of directing this Court to the portions of the record relevant to its challenge. As we have previously stated, the reviewing court "cannot be expected to delve through the record to unearth factual support favorable to [the] appellant." *Rollins v. Capital Plaza Assocs., L.P.,* 181 Md. App. 188, 201 (2008) (citing *von Lusch v. State,* 31 Md. App. 271, 282 (1976)).

Even if we could consider BSC's argument on the merits based on the evidence on which it relies, we would nevertheless affirm the circuit court's granting of partial summary judgment. BSC claims that a dispute of material facts exists regarding the "right to participate" provision because BSC and MFV disagree on whether MFV did, in fact, participate. BSC maintains that MFV had an equal chance to participate in its dealings with St. Jude because 1) MFV had its own settlement negotiations with St. Jude, and 2) MFV knew that BSC was having discussions with St. Jude but never asked to join in those discussions.

While MFV does not dispute that those two things are true, BSC neglects to note the *timing* of the two 2006 settlement discussions: MFV's discussions with St. Jude occurred in June of 2006 and concluded without reaching an agreement, whereas the BSC-St. Jude discussions took place through June and July of 2006, leading to the BSC-St. Jude Settlement on July 29, 2006. While MFV knew that BSC was negotiating with St. Jude in June, it was unaware that negotiations between the two carried into July.[13]

---

[13] MFV alleged that BSC represented that settlement talks would continue up until June 30, 2006. It claims that it relied on this as a deadline for the discussions with St. Jude, and therefore was surprised to hear of discussions continuing into July 2006. MFV

11

BSC offers no evidence to show that MFV knew of the July discussions. Thus, the *material* facts – MFV's lack of knowledge about the BSC-St. Jude Settlement – are undisputed. No evidence at trial showed otherwise.

> **b. The circuit court did not err in allowing the jury to decide whether BSC violated the "mutual agreement" provision of the 2004 License Agreement.**

Next, BSC argues that "the circuit court erred by allowing the jury to find that BSC breached the 'mutual agreement' provision." The provision reads: "[BSC] shall, subject to mutual agreement between [BSC] and MIROWSKI, bring and conduct suit or actions against any infringer . . . ." BSC moved for summary judgment on the issue, which the circuit court denied, finding the term unambiguous. At trial, the circuit court instructed the jury on its interpretation of the term.[14] BSC challenges this interpretation as well as the jury's decision on the issue. On review, we find that the circuit court did not err in interpreting the provision and in allowing the jury to determine whether BSC breached it, and we will not overturn the findings of the jury.

> **i. The circuit court's interpretation of the "mutual agreement" provision was appropriate.**

Again, we review the circuit court's decision of a motion for summary judgment *de novo*. *Injured Workers' Ins. Fund*, 190 Md. App. at 450-51. When reviewing the denial of summary judgment, we look to see if there existed a genuine dispute of material

---

was left with the impression that negotiations with St. Jude would not progress further between it or BSC, and they were going to trial.

[14] BSC itself asked the court to instruct the jury on the court's interpretation of the "mutual agreement" provision.

facts. *Id.* When reviewing contract construction, the circuit court may grant summary judgment if a contract is unambiguous. *GMG Capital Invs., LLC v. Athenian Venture Partners I, L.P.,* 36 A.3d 776, 778 (Del. 2012). Our review of the court's determination of whether the contractual language is ambiguous is also *de novo*. *Calomiris v. Woods*, 353 Md. 425, 435 (1999).

BSC relies heavily on the Indiana contract proceedings, in which the federal district judge found the "only reasonable interpretation of the phrase 'subject to mutual agreement' in the contract is that [BSC] *must* bring and conduct suit against infringers with sales exceeding $75,000, *unless* Mirowski and [BSC] agree that suit should not be brought." *Boston Scientific Corp. v. Mirowski Family Ventures, LLC* ("BSC 2012"), No. 1:11-CV-736-WTL-DKL (S.D. Ind., Nov. 30, 2012) (emphasis in original). What this means, the district judge explained, is that "'mutual agreement' applies not to [BSC's] subsequent decisions in the course of litigation, but rather explains the circumstances under which [BSC] is relieved of its obligation to bring suit." *Id.* The judge, therefore, found the "mutual agreement" provision inapplicable to the BSC-St. Jude Settlement. *Id.* Accordingly, as the circuit court observed, the Indiana district court's construction leaves the "right to participate" provision as "the only ground for potential contractual liability."

We are not bound to afford any weight to the decisions and findings of the Indiana district court deciding the contractual dispute between MFV and BSC. *See Cates v. State,* 21 Md. App. 363, 372 (1974) (explaining that rulings from other jurisdictions are persuasive authority, and "[i]f the reasoning which supports them fails to persuade, they

13

are no authority at all").  Unlike the Indiana district court, the circuit court found "mutual agreement" to be an unambiguous term meaning:

> BSC must consult with and advise Mirowski of its intentions at such a time and under such circumstances that would enable Mirowski to take action to protect itself, if it chooses to do so.  Whether that occurred in this case, is a question of fact.

The circuit court stated that the contract term is an "express promise" made by BSC to MFV that is not irrelevant.

A contract is not ambiguous merely "because the parties disagree as to its proper construction," *Trustees of Indiana Univ. v. Cohen*, 910 N.E.2d 251, 257 (Ind. Ct. App. 2009), but rather is ambiguous "only if reasonable persons would differ as to the meaning of its terms."  *Oxford Fin. Grp., Ltd. v. Evans*, 795 N.E.2d 1135, 1142 (Ind. Ct. App. 2003) (citations omitted).  When interpreting an unambiguous contract, "a court gives effect to the parties' intentions as expressed in the four corners of the instrument and clear, plain, and unambiguous terms are conclusive of that intent."  *Id*. (citation omitted).  However, "the court is under an obligation to read the agreement in a manner which harmonizes its provisions as a whole and to give effect to the parties' expressed intent."  *Trustees of Indiana Univ.*, 910 N.E.2d at 257 (citations omitted); *see also Oxford Fin. Grp., Ltd.*, 795 N.E.2d at 1142 (*"Particular words and phrases cannot be read alone and the parties' intentions must be determined by reading the contract as a whole."*) (Citation omitted).

Looking at the "mutual agreement" provision in the context of the 2004 License Agreement "as a whole," *id.*, we agree that the term is unambiguous because reasonable

persons would not differ as to its meaning when the provision is read as a whole rather than examining each phrase therein in isolation. *Oxford Fin. Grp., Ltd.*, 795 N.E.2d at 1142. The 2004 License Agreement overall outlines the rights and responsibilities of BSC and MFV individually and to each other with regard to the '299 patent. It affords BSC the exclusive license to MFV's patents and the right to bring suit to protect them. MFV, as the patent holder, therefore, has a serious stake in the outcome of any potential dispute or litigation between BSC and infringers. Thus, construing the portion of the contract that calls for "mutual agreement" to "bring and conduct suit or action against infringers" to mean anything short of the obligation BSC has to inform and seek MFV's advice on its actions in a suit would require reading the contract to mean that MFV reserved no authority for itself to have a say or impact the status of its patents once litigation commenced. Such a reading of the contract, as the circuit court and MFV point out, would permit BSC to act in bad faith by settling without MFV's permission. No reasonable person could read the agreement that way.

Furthermore, the interpretation of the Indiana district court, which BSC urges us to adopt, is that the "mutual agreement" provision merely "explains the circumstances under which Boston Scientific is relieved of its obligation to bring suit," but does not apply to BSC's "subsequent decisions in the course of litigation." However, the language of the agreement reads that "[BSC] shall, subject to mutual agreement between [BSC] and MIROWSKI, bring and *conduct* suit or actions . . . ." (Emphasis added). The Indiana district court's construction completely disregards the term "conduct," which immediately follows the provision "subject to mutual agreement." A reading of the plain

15

language of the agreement urges the circuit court's interpretation. Accepting the circuit court's interpretation of the provision, we also conclude that it appropriately instructed the jury as to what "mutual agreement" means.

### ii. The matter was appropriately considered by the jury, whose factual finding was proper.

BSC next argues that the jury did not have sufficient evidence to find that BSC violated the "mutual agreement" provision, even as interpreted by the circuit court, and asks us to overturn the jury's factual finding. We disagree with BSC and see no reason to overturn the jury's finding. A case must be submitted to the jury for consideration if there exists "any evidence, no matter how slight, that is legally sufficient to generate a jury question." *Publish Am., LLP v. Stern*, 216 Md. App. 82, 97 (2014) (citation omitted). There was ample evidence presented at trial to present the question to the jury. The jury heard testimony on the issue from: Sidney Silver, MFV's counsel; Ginat Mirowski; and four of BSC's in-house counsel. BSC also presented its own fact witnesses. There being "sufficient" evidence to send the question to the jury, "the jury and the jury only has the power to assess the weight of the evidence, a power which passes to the trial judge's discretion upon motion for a new trial." *Owens-Corning Fiberglas Corp. v. Garrett*, 343 Md. 500, 521 (1996) (citation omitted). The reviewing court "do[es] not review the weight of the evidence after it has been passed upon by the jury." *Benkoe v. Plastic Assembled Prods., Inc.*, 231 Md. 419, 420 (1963) (*per curiam*). Because the question was appropriately presented to the jury, and the jury properly made its determination, we will not disturb its finding.

16

## II. The jury appropriately found "causation" in the breach of contract claim between BSC and MFV.

"Under Indiana law . . . , causation is an essential element of liability in a breach of contract claim." *Shepard v. State Auto. Mut. Ins. Co.*, 463 F.3d 742, 744 (7th Cir. 2006) (citation omitted). The aggrieved party in a contract claim "must prove that the alleged breach of contract was a cause in fact of his loss, which requires a showing that the breach was a 'substantial factor' in bringing about the plaintiff's damages." *Id.* (citation omitted). BSC argues that MFV failed to show such "causation" for its damages in this case because MFV had a "choice" regarding whether to accept the terms of the BSC-St. Jude Settlement. Because of this choice, BSC suggests that its actions were not a "cause in fact" in MFV's damages.

BSC asks for a remand and new trial on the basis of "causation" because the circuit court should not have admitted the MFV-St. Jude Stipulation Agreement ("the stipulation"),[15] also signed by BSC, that the '119 patent was not invalid.[16] BSC contends first that the admission of the stipulation is in violation of Rule 408 of the Federal Rules

---

[15] The MFV-St. Jude Stipulation Agreement was reached in June 2007, a year after the BSC-St. Jude Settlement, following the dismissal of the Delaware litigation.

[16] The stipulation reads: "Pursuant to the terms of the confidential Settlement Agreement, and subject to its conditions, the St. Jude defendants hereby stipulate, acknowledge, and agree that one or more of the accused products infringe at least one claim of U.S. Reissue Patent No. Re 38,119 and the asserted claims of the '119 patent are not invalid or unenforceable."

17

of Evidence, and thereby Md. Rule 5-408,[17] and, therefore, constitutes reversible error. Second, it argues that the stipulation in not binding on BSC. We disagree.

Maryland Rule 5-408 states: "(a) The following evidence is not admissible to prove the validity, invalidity, or amount of a civil claim in dispute: . . . (3) Conduct or statements made in compromise negotiations or mediation." BSC, invoking Md. Rule 5-408 in this context, requires that the stipulation of validity be a statement "made in compromise negotiations or mediation." *Id.* BSC notes, however, that the stipulation was entered into "*following* a good-faith mediation." (Emphasis added). As we have previously noted about the admission of settlements as subsequent evidence:

> The purpose of Rule 5-408 is to encourage the settlement of lawsuits by ensuring that parties need not fear that their desire to settle pending litigation and their offers to do so will be construed as admissions. But that rule is plainly not applicable to the instant case because the evidence at issue concerned previously settled claims and not promises to settle an existing claim.

*Bittinger v. CSX Transp. Inc.*, 176 Md. App. 262, 276-77 (2007) (internal citation omitted). As in *Bittinger*, Md. Rule 5-408 is equally inapplicable here because the '119 patent validity stipulation was part of a "previously settled claim[]," not a "promise[] to settle." *Id.* Talks and discussions taking place during mediation and negotiation meetings are part of the "promises to settle," and it is the statements made during these discussions that are barred by Md. Rule 5-408, not the finished product coming out of them. "[T]he admission of evidence is committed to the considerable and sound

---

[17] "Offers of compromise of disputed claims [are] inadmissible to show liability or damages" under both Maryland and federal law. Joseph F. Murphy & Paul W. Grimm, *Comparative Guide to the Maryland & Federal Rules of Evidence* 157 (2007).

discretion of the trial court" and will not be disturbed in the absence of abuse of that discretion. *Id.* at 273. We see no such abuse here, and therefore will not remand on this basis. The properly admissible stipulation operated like a "consent judgment and adjudication on the merits."[18]

In the alternative, accepting that the stipulation has *res judicata* effect, BSC argues that the stipulation nevertheless is not binding in the contract dispute between BSC and MFV because it was part of a settlement agreement between only MFV and St. Jude. BSC asserts that "while BSC (as a party to the litigation) signed the St. Jude stipulation . . . BSC agreed only to the fact that St. Jude entered into a stipulation." Having "not itself enter[ed] into or approve[d] the stipulation," BSC should have been allowed to raise St. Jude's invalidity defenses in its defense against MFV.

BSC's argument fails because BSC was, in fact, a party to the stipulation of the validity stipulation for the '119 patent for the purposes of preclusive effect. The language of the stipulation points us to that understanding. The stipulation states:

> The Mirowski plaintiff and the defendants [St. Jude], having entered into a confidential settlement of their dispute following a good-faith mediation, it is now stipulated and agreed by and among *the parties to this action*, represented by their attorneys . . .

---

[18] Quoting the circuit court. The Delaware litigation, which preceded the stipulation and served as the basis of the parties' negotiations, was dismissed with prejudice by the Delaware district court. A dismissal with prejudice accompanied by a stipulation of validity and infringement "operated under doctrine of claim preclusion to bar patent holder from bringing another suit" as to issues alleged in the stipulation. *Hallco Mfg. Co. v. Foster*, 256 F.3d 1290 (Fed. Cir. 2001).

19

(Emphasis added). At the time, BSC and MFV were still co-plaintiffs in the Delaware case. Thus, even though the settlement negotiations may have involved only MFV and St. Jude, the "parties to this action" are MFV, BSC, and St. Jude, with the "action" being the Delaware litigation. BSC, represented by attorneys, appropriately signed the stipulation as a party to the action, doing more than merely acknowledging that MFV and St. Jude entered into the stipulation, as it contends. By signing the agreement, BSC also approved the stipulation. Therefore, the language of the stipulation does not constrict it as applying only between MFV and St. Jude, but as to *all* three parties and their relationship with each other.

Importantly, we must note that BSC's argument that the admission of the stipulation was wrong because it prevented BSC from presenting evidence of the patent's invalidity throughout the trial is without merit. BSC had the opportunity to present such evidence throughout the trial. The jury heard and considered testimonial evidence put on by BSC about St. Jude's defenses in the Delaware litigation from a number of witnesses: Peter Gafner, a BSC attorney who spoke to St. Jude's "three defenses" in Delaware; Tom Filarski, a patent attorney who spoke to the "no error defense St. Jude asserted in the Delaware case;" and David Benditt, a medical doctor and professor who testified as to his opinion testimony in support of St. Jude's defenses in the Delaware case. The evidence is clear that the jury heard ample evidence about the St. Jude Delaware defenses.

III. **The jury appropriately decided the 2004 Royalties Agreement claim.**

20

At trial, MFV presented "three independent reasons"[19] to support the 2004 Royalty Agreement claim (or "Count One"). In Count One, MFV asserted that BSC owed the full amount of the royalties on ICDs sold in 2002-2003 pursuant the 2004 Royalties Agreement. First, MFV posited that the royalties had already accrued in the normal course of business under the 1973 license in the amount of $55.6 million, and that MFV relied on this amount when it signed the 2004 Royalties Agreement (or "accrual argument"). Second, MFV argued that it is owed the full amount because all ICD sales, not just ICDs known to have performed the patented method, are royalty bearing because MFV, as the owner of the patented method, has the power to legally enjoin all ICD sales *capable* of performing the infringed method. Third, MFV argued before the jury that it was owed the full amount of the royalties under the 2004 Royalty Agreement because, even under BSC's interpretation, there is evidence that 98% of the ICDs during the 2002-2003 time frame performed, and thus infringed, the patented method. The jury assessed the evidence presented and awarded MFV $86.5 million for the royalties on all devices as a result of BSC's breach of the 2004 Royalty Agreement.

BSC argues that the jury's verdict in favor of MFV on the 2004 Royalties claim must be vacated because it may have rested on MFV's first reasoning, which BSC deems

---

[19] BSC mischaracterizes MFV's three evidentiary arguments as "legal theories." We disagree with this characterization. MFV merely presented three types of evidentiary support for one single legal theory: the breach of the 2004 Royalty Agreement. These arguments were appropriately before the jury which then weighed each parties' arguments and evidence regarding the claim and award damages based on that claim.

to be a "legally erroneous" theory of liability based "on evidence that never should have been admitted." The other two reasons MFV presented are cause for remand as well, BSC claims, because they "implicated patent law issues" on which the jury was not instructed. We disagree.

### a. MFV's accrual argument is not legally erroneous.

BSC alleges that the accrual argument is "legally erroneous" because it "turned on" evidence that should have never been admitted. At trial, the circuit court admitted as evidence BSC memoranda that discussed its obligations under the 2004 Royalty Agreement.[20] The memoranda were admitted along with other forms of parol evidence on both sides to shed light on the interpretation of the 2004 Royalty Agreement, including the ambiguous phrase "all royalties that accrued pursuant to the License Agreement on products covered by any such claim of the '288 patent." BSC supports its argument that the memoranda should have been excluded by referencing only the decision made by the Indiana district court during the Indiana proceedings.[21] Rulings made by the Indiana court, as mentioned earlier, carry no weight in our review. It further has no bearing in the instant case because the Indiana court, unlike the circuit court,

---

[20] The circuit court denied BSC's Motion *in limine* To Exclude Evidence or Argument Related to "Accrued Royalties" on the '288 Patent.

[21] BSC also supports its proposition by referencing two federal cases from the Northern District of Illinois. The cases fail to serve as persuasive authority because they are not on point, not discussing parole evidence, contract interpretation, or Maryland or Indiana law.

22

found that the operative phrase was *not* ambiguous, making any parol evidence irrelevant in the case before him.

Although the memoranda was properly admitted, the court curbed any prejudice the evidence may have had on BSC issuing a limiting instruction on the evidence, at BSC's request and which BSC drafted. Where admitted evidence "is admissible as to one party or for one purpose but not admissible as to another party or for another purpose, the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly." Md. Rule 5-105. The instructions to the jury provided:

> [Y]ou may hear during the trial, either testimony or see documents relating to Boston Scientific's accrual of royalties potentially payable to the Mirowksi family pending the outcome of the St. Jude Indiana litigation. I instruct you that evidence of Boston Scientific's accrual of potential royalties payable to the Mirowski family pending the St. Jude Indiana litigation is not to be considered by you an admission of liability by Boston Scientific. You must determine, based on all of the evidence whether Boston Scientific did or didn't fail to pay all of the royalties due covered by claim four of the 288 patent. In other words, whether or not they did or didn't [b]reach the January 2004 agreement [Royalty Agreement] to pay the royalties for 2002 and 2003 based on all the evidence you hear at trial.

BSC contends that this limiting instruction was insufficient because it "cannot cure an erroneous decision to admit evidence that has no legitimate purpose." However, the memorandum had a "legitimate purpose:" the circuit court admitted the memoranda as parol evidence to clarify what it found to be an ambiguous phrase in the 2004 Royalty Agreement. *See, e.g., Tricat Indus., Inc. v. Harper*, 131 Md. App. 89, 107 (2000) (explaining that "parol evidence is admissible when the written words are sufficiently ambiguous") (citation omitted).

23

We, therefore, will not disturb the jury's verdict with regard to Count One on the basis of a "legally erroneous" theory because the evidence was appropriately admitted and the jury properly considered it to make its determination.[22]

### b. The circuit court did not commit error by not instructing the jury on patent law issues regarding MFV's second and third arguments for Claim One.

MFV presented two other alternative evidentiary bases for recovering under the 2004 Royalty Agreement. The jury did not need to be instructed on issues of patent law because the relevant information it needed to make a decision as to the breach of contract were presented before it.

### i. Circuit court did not err in refusing to construe the term "cardioversion."

BSC claims that the circuit court erred in refusing to construe the term "cardioversion" and instead left it to the jury to determine the meaning. Claim 4 involved the patented methodology of treating an abnormal heartbeat using "multimode therapy," with one mode being "cardioversion." Thus, whether the ICDs performed "cardioversion" was significant in whether they were covered by the patented method and, therefore, whether MFV could collect royalties on their sales. BSC argues that the

---

[22] BSC argues that because one of MFV's arguments in Count One is "legally erroneous," the whole verdict must be vacated. BSC supports its assertion by citing several cases standing for the proposition that if there are multiple potential grounds for a jury's verdict and one is legally erroneous, the verdict must be vacated. *See Flowers v. Tandy Corp.*, 773 F.2d 585, 591 (4th Cir. 1985); *Gill v. Rollins Protective Servs. Co.*, 722 F.2d 55, 59 (4th Cir. 1983); *United NY & NJ Sandy Hook Pilots Ass'n v. Halecki*, 358 U.S. 613 (1959); *Prince George's Cnty v. Longtin*, 419 Md. 450, 470 n.15 (2011). Because there was no "legally erroneous" ground on which the jury could have made its determination, we will not vacate its verdict in favor of MFV with regard to Count One.

24

circuit court erred in refusing to re-construe the term and leaving "it to the jury to resolve any disputes about the meaning of the [] claim's construction" by the Indiana court.

In the St. Jude Indiana Litigation, the Indiana district court interpreted "cardioversion" to mean "the application of non-pacing electrical pulses designed to stimulate sufficient heart tissue to correct an arrhythmia, with energy levels generally below those used for defibrillation." *Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*, 381 F.3d 1371, 1374 (Fed. Cir. 2004). During this litigation, MFV and BSC were not adverse to each other and together supported this definition.[23] This definition is what MFV presented to the jury in circuit court. Now, BSC claims that the term "cardioversion" required clarification by the circuit court because each side accused the other of applying the incorrect definition of the term at trial.

The circuit court appropriately denied BSC's request for further claim construction and accepted the Indiana district court's definition of the term, finding the construction of the term to be "judicial admissions [by BSC and MFV], binding both clients not only for [the St. Jude Indiana Litigation] but in other litigation as well." *Campfield v. Crowther*, 252 Md. 88, 100 (1969) ("A judicial admission by an attorney in the presence of his client is admissible in subsequent litigation."). BSC mistakenly asserts that the circuit court left the construction of the term to the jury. In its order, the circuit court adopted the undisputed construction of the Indiana district court, leaving to the jury only the *application* of the claim.

___

[23] This definition also appears, unchallenged, in the Indiana proceedings between MFV and BSC in the district court's recounting of the facts of the case.

### ii. MFV's argument for recovery based on obtaining potential injunctions on sales of ICDs is not legally erroneous.

Next, BSC contends that MFV's argument that it was entitled to royalties on ICD sales during 2002-2003 because it could have obtained an injunction on the sales of all those ICDs is "legally erroneous under applicable patent law." When used in patent licenses, the term "covered," BSC argues, applies only to the product or technology that actually infringes the claim; the terms "covers" and "infringes" are "synonymous" according to BSC. In support, BSC provides a list of cases where products were both covered by and infringed the claims in question. *See Hoechst-Rousel Pharm., Inc. v. Lehman,* 109 F.3d 756, 764 (Fed. Cir 1997) ("Since the registered product would directly infringe the claims during use, the product is covered by the claims[.]); *Mitsubishi Chem. Corp. v. Barr Labs, Inc.*, 718 F. Supp. 2d 382, 390 (S.D.N.Y. 2010) ("The defendants concede that their proposed generic product is covered by and would infringe all four claims of the '052 patent."); *Rambus Inc. v. Hynix Semiconductor Inc.*, 254 F.R.D. 597, 602 (N.D. Cal. 2008) ("[T]he patentee must show that the marketed product embodies (that is infringes or is covered by) the patent claim."). However, BSC misreads these cases. None stand for the proposition that a product or technology is *only* covered by a patent *if* it infringes the patented method or technology, as BSC suggests. Rather, these opinions merely include language where a claim was both covered by a patent *and* infringed the patent. Notably, the citation to *Mitsubishi Chemical Corporation v. Barr Labs, Inc.* references the facts section of the opinion, which states merely the independent

agreement of the parties in the case, not a discussion of pertinent law governing patents, providing no persuasive authority for us.

Furthermore, looking at the merits of MFV's argument, we conclude that MFV did not err in its reasoning that because it legally could have stopped the sale of all ICDs, it was entitled to royalties on those ICDs. The United States Court of Appeals for the Federal Circuit, which is the only appellate-level court with the jurisdiction to hear patent case appeals, has affirmed injunctions against sales of all products where the product's label "would inevitably lead consumers to practice the claimed method." *AstraZeneca LP v. Apotex, Inc.*, 633 F.3d 1042, 1060 (Fed. Cir. 2010). It has also found liability for induced infringement when an entity "offers a product with the object of promoting its use to infringe, as shown by clear expression or other affirmative steps taken to foster infringement." *DSU Med. Corp. v. JMS Co. Ltd.,* 471 F.3d 1293, 1305-06 (Fed. Cir. 2006). The sale of a product specifically labeled for use in a patented method constitutes inducement to infringe that patent, and usually is also contributory infringement. *See AstraZeneca,* 633 F.3d at 1060. Under this applicable patent law, because BSC (1) was designing and manufacturing ICDs to perform cardioversions, (2) instructed its sales representatives to program ICDs to perform cardioversions, (3) included directions with each ICD with instructions on how to program the ICD to perform cardioversions, and (4) admitted that if cardioversions were performed according to the products' label, the '288 patent covered the ICD, the ICDs were covered by the patent and thus the jury's award for royalties was appropriate.

27

### iii. The circuit court did not err by not providing patent law instructions to the jury.

BSC contends that because "MFV's second and third theories of liability under Count One raised a number of complex issues particular to patent law," the circuit court should have instructed the jury on the patent law governing these issues. BSC reminds us in their argument that "[t]he party arguing that an instruction should have been given bears the burden of proving prejudice and error." *See Farley v. Allstate Ins. Co.*, 355 Md. 34, 47 (1999).

However, as the party bearing the burden of proof, BSC merely provides that the prejudice and error are "self-evident," with no other explanation or support. We will not make the argument for BSC. An appellate court is not required to address an argument on appeal when the appellant has failed to adequately brief his argument. *Honeycutt v. Honeycutt*, 150 Md. App. 604, 618 (2003) (citing Md. Rule 8-504(a), requiring that a brief contain an "[a]rgument in support of the party's position"); *see also Klauenberg v. State*, 355 Md. 528, 552 (1999) (stating that an appellate court need not consider "arguments not presented in a brief or not presented with particularity"). We fail to see how the prejudice to BSC is "self-evident," and because BSC fails to provide any support to that claim, this Court need not address this issue. *See Beck v. Mangels,* 100 Md. App. 144, 149 (1994) (refusing to address appellants' questions where appellants failed to offer substantial argument).

### c. The circuit court did not err in finding that the overseas sales of the ICDs were royalty bearing.

In its final argument, BSC claims that the circuit court erred in deciding that MFV was entitled to royalties on ICDs sales made abroad during 2002-2003 on top of its sales within the United States.  Pre-trial, MFV argued that sales made abroad were covered by Claim 4 under 35 U.S.C. § 271(f), at least in the time they were made.  Section 271(f)(1) reads:

> Whoever without authority supplies or causes to be supplied in or from the United States all or a substantial portion of the components of a patented invention, where such components are uncombined in whole or in part, in such manner as to actively induce the combination of such components outside of the United States in a manner that would infringe the patent if such combination occurred within the United States, shall be liable as an infringer.

The parties made the same argument during the St. Jude Indiana Litigation.  During that time period, MFV and BSC were both plaintiffs on the same side, arguing the position that MFV asserts here.  In 2009, however, the Federal Circuit reviewing the St. Jude Indiana Litigation decided that Section 271(f) does not apply to method or process patents (specifically Claim 4 of the '288 patent).  *Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*, 576 F.3d 1348, 1365 (Fed. 2009).  In other words, the 2009 Federal Circuit changed the law so that method patents cannot be enforced on overseas sales, which would have allegedly resulted in lower damages on Count One for MFV.[24]  The circuit court, however, relied on state contract law and judicial estoppel to rule on the issue, instead of patent law.  It did not err in doing so.

---

[24] MFV attributed $17,134,298 of the approximate $86 million of the total royalties to overseas sales.

First, the circuit court determined that the law in place at the time the parties entered the 2004 Royalty Agreement governed royalties of overseas sales for the pertinent period, 2003-2004. In looking at what law governs in contracts between parties, we note:

> It is well settled in Indiana that generally, unless the contract provides otherwise, all applicable law in force at the time the agreement is made impliedly forms a part of the agreement without any statement to that effect, but laws enacted subsequent to the execution of the agreement are not deemed part of the agreement unless the contractual language clearly indicates such to have been the intention of the parties; the parties are presumed to have had the law in mind.

*Ethyl Corp. v. Forcum-Lannom Associates, Inc.*, 433 N.E.2d 1214, 1220 (Ind. Ct. App. 1982) (citations omitted); *see also Julian v. Christopher*, 320 Md. 1, 10 (1990) (refusing to "rewrite" the contract between the parties because "we should assume" that parties executing contracts when certain laws govern the subject of their contract "were aware of [the law at the time] and the implications drawn from the words they used"). Thus, the 2009 holding of the Federal Circuit has no bearing on BSC's responsibility to pay royalties for 2002-2003 sales pursuant the 2004 Royalties Agreement.

Second, the circuit court determined that the doctrine of judicial estoppel prevented BSC from arguing to the jury that overseas sales were not covered. During the St. Jude Indiana Litigation, BSC argued that overseas sales *were* covered. We have previously identified three factors that inform whether there is judicial estoppel in a particular case: first, "whether the party's later position is clearly inconsistent with its earlier position;" second, "whether the party succeeded in persuading the court in the earlier matter to accept its position, so that judicial acceptance of the contrary position in

30

the later matter would create the perception that one of the courts had been misled;" and third, "whether the party seeking to assert the inconsistent position in the later matter would derive an unfair advantage, or would impose an unfair detriment on the other party, from being permitted to do so." *Abrams v. Am. Tennis Courts, Inc.*, 160 Md. App. 213, 225-26 (2004) (citation omitted). While these factors are not "inflexible prerequisites," they do provide guidance. *Id.*

Applying the *Abrams* factors to the instant case, we agree with the circuit court that BSC is barred by judicial estoppel from raising the overseas sales claim. First, BSC's current position is "clearly inconsistent" with its position during the St. Jude Indiana Litigation; BSC has switched sides from arguing that overseas sales were covered to overseas sales are not covered. Second, BSC did succeed in the St. Jude Indiana Litigation, at least on the trial level, in persuading the court of its position. *Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*, 418 F. Supp. 2d 1021, 1044 (S.D. Ind. 2006) ("[T]his court cannot conclude as a matter of law that [35 U.S.C.] section 271(f) does not apply to the method claim at issue here."). Third, BSC "would derive an unfair advantage" in switching its position. BSC used the winning argument in the St. Jude Indiana Litigation, that overseas sales were covered, in its subsequent negotiations with St. Jude that led to the BSC-St. Jude Settlement later on, which resulted in St. Jude dropping several pending litigations against BSC. After obtaining that benefit, BSC now wants to avoid the approximately $17 million in royalties from overseas sales that it contractually owed to MFV. With all three factors weighing heavily against BSC, we are persuaded that BSC is judicially estopped from bringing this claim. If not, "BSC would

31

reap the benefit of 'blowing hot and cold.' The law does not countenance that result."

*Vogel v. Touhey*, 151 Md. App. 682, 722 (2003) (citation omitted).

## IV. Conclusion

For the reasons set forth above, we affirm the circuit court in the issues raised by BSC.

> **JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**